**UNITED STATES of America**

v.

**John W. FRIEL.**

**Crim. No. 80–315.**

United States District Court, E.D. Pennsylvania.

June 19, 1984.

Stanford Shmuckler, Philadelphia, Pa., for petitioner.

Glenn B. Bronson, Asst. U.S. Atty., Philadelphia, Pa., for respondent.

## BENCH OPINION *

LOUIS H. POLLAK, District Judge.

The defendant, Mr. Friel, has moved for vacation of his conviction under 28 U.S.C. § 2255. That motion has taken, as its pred-

---

* This is a modestly edited version of the transcript of an oral opinion delivered at the close of argument on May 18, 1984. The argument followed three days of evidentiary hearings held on September 6, October 6, and November 4, 1983. After an unfortunate delay in obtaining notes of testimony, the parties made extensive written submissions. This Opinion constitutes the court's findings of fact and conclusion of law based upon the pleadings, evidence, written submissions, and argument.

icate, an extended list of claims by Mr. Friel that his trial counsel, Oscar Gaskins, Esquire, did not measure up to the level of faithful and effective representation mandated by the Sixth Amendment. Mr. Friel stands convicted of mail fraud arising out of an arson. The jury found that Mr. Friel had been involved in the burning of his club, Bramwells.

The contention that Mr. Gaskins was not singlemindedly faithful to Mr. Friel's interests focuses on certain claims that Mr. Gaskins had conflicts of interest that precluded or tended to preclude fulfillment of the duties of entire loyalty to Mr. Friel implicit in the constitutional mandate for assistance of counsel. Those asserted conflicts relate on the one hand to claims that Mr. Gaskins' representation of Mr. Friel was in some measure inhibited by his prior representation of, and continued friendship and colleagueship with, Robert Thomas. Thomas was perceived by Mr. Gaskins, and I think properly, as cast by the indictment against Mr. Friel in the role of an unindicted co-conspirator.

The conflict-of-interest claims also argue that Mr. Gaskins had a direct monetary interest in civil litigation being pressed by Mr. Friel against the manufacturer of the ice cream freezer that was in Bramwells. The civil litigation that was incipient when the criminal case was being prepared for trial was litigation which took as its departure a theory that the fire originated in some electrical defect in the freezer. This theory, if credited, would have constituted not only a viable basis for the civil litigation, but a viable defense against the criminal charges.

One of the claims of failure adequately to represent Mr. Friel also overlaps with the claim that Mr. Gaskins was hobbled by a divided loyalty between Mr. Friel and Mr. Thomas. Mr. Friel claims that Mr. Gaskins did not report to Mr. Friel prior to the trial a government proposal that Mr. Friel plead guilty and cooperate with the Government against Mr. Thomas. This proposal would presumably have carried with it the prospect of some benefits to Mr. Friel.

There are a number of other claims, both of divided loyalty and of acts of omission on Mr. Gaskins' part, that are asserted to constitute lawyerly conduct below the standard. I will not canvass those other claims at this time, with a single exception, which I wish now to address.

■ ，This morning's argument considered, among other matters, the claim that Mr. Gaskins failed to investigate information given to Mr. Gaskins by Mr. Friel. Mr. Friel reported to Mr. Gaskins that one Christopher Brooks asserted to Rebecca Willis and Benjamin Ward that he, Brooks, had set the Bramwells fire because he was angry at Mr. Friel who had dismissed Brooks from employment. Mr. Brooks apparently also asserted that he had tried to hide the arson by pouring water on the freezer to make it appear that an electrical difficulty in the freezer had generated the fire.

I want to address that claim in some detail. It is common ground that Mr. Friel did say something to his attorney, Mr. Gaskins, about a confession by somebody that that somebody had set the fire that destroyed Bramwells. Mr. Friel testified in some detail about the information that he communicated to his attorney. Mr. Gaskins testified briefly, and with very little precision, about matters that clearly he did not remember very well. However, the constitutional claim brought forward by Mr. Friel, which is that Mr. Gaskins fell short of the constitutional standard of effective representation by failing to make an investigation, makes the attorney's understanding of what information had been supplied him at least the starting point for an inquiry into whether Mr. Gaskins' non-inquiry into the matter fell short of constitutional standards.

With that in mind, I turn first to Mr. Gaskins' testimony, as it was given on direct examination:

Q. Have you ever heard of an individual named, "Christopher Brooks" or "Grace"?

A. Well, when you ask me "Have I ever," I certainly am familiar, if Mr. Brooks is the person who is supposed to have burnt down Bramwells, then, yes, I have heard of Mr. Brooks.

Q. So you did hear at some time that Mr. Brooks had said that he burned down Bramwells.

A. Yes.

Q. Do you recall when?

A. I don't know whether or not I had heard that it was Mr. Brooks. I knew there was someone who had confessed to having burned down Bramwells.

Q. Do you recall when it was that you heard that?

A. I am certain that I heard that before the trial.

Q. Now, did you—

A. And during the trial.

Q. Did you investigate that lead?

A. No.

Q. How come?

A. Well, first of all, the person came out of that small community which included Mr. Friel, Mr. Lance, Mother Light, the girl that works at the "Black Banana", whatever her name is, all of that group of people, they were familiar with him. To me it constituted just a rumor.

I didn't receive any specific direction to investigate it. It was totally inconsistent with what the factual situation appeared to be there; namely, that someone had come in, broken a back window, and dropped a faggot through the window and in that way started the fire, which is what I understand that this person is supposed to have been saying.

And I don't believe my client, I did not perceive that my client was taking it seriously and I did not take it seriously.

Q. So Mr. Friel never told you to pursue that lead, did he?

A. Not that I ever—no, Mr. Friel never told me to pursue that lead.

Notes of Testimony for November 4, 1983, at 72–73.

Mr. Gaskins gave comparable responses to examination by the Court:

A. My only recollection is that Mr. Friel, I got the information basically from Mr. Friel. I can't recall whether or not there was a reference to it in the tapes or not.

It appears that whoever was responsible was someone who was well-known in that small community, had come up and said that he had tried to throw something through the window, through the back window, and caused the fire.

I perceived it at this time as being of no consequence. It was totally inconsistent with our theory of how the fire started. It was totally inconsistent with any information we had about the placement and laying of glass and the two people who allegedly had overheard this confession were never presented to me as all of the other witnesses were presented to me, so I naturally assumed that Mr. Friel perceived that confession in the same light.

Q. Now, this you say was all information which to your best recollection came to you from Mr. Friel.

A. Yes, I can't explain to you, Judge, when I knew that or when it was told to me.

Q. What, if anything, do you remember about the, you just said two persons from whom the information derived, presumably before it reached Mr. Friel.

A. I only remember that there were persons. I only remember now that there were two persons because I have read the description of the incident in the papers which were filed here.

Q. Does that refresh your recollection in any way?

A. No sir, it does not. It refreshes my recollection that there were witnesses or a witness who had overheard someone confessing to have started the fire.

Q. Do you, to your best recollection, apart from hearing Mr. Friel's report, do you remember discussing this aspect, that is to say, the alleged confession with anybody, Mr. Morley, for example?

A. Oh, I am sure that—I guess your question is more specific than that.

Do I remember, The answer is, no. *Id.* at 114–115.

Now, it is the case, as Mr. Gaskins testified, that arson by another person was inconsistent with the anticipated defense that the fire originated in an ice cream freezer. Mr. Gaskins expected to buttress this defense with expert testimony which was also expected to be presented in the civil litigation. Beyond that, it is Mr. Gaskins' testimony that he understood that the declarant came out of the small community which included Mr. Friel, Richard Lance (Mr. Friel's co-defendant), Mother Light (an associate of Bramwells who was the Government's chief witness against Mr. Friel and Mr. Lance), and others. Mr. Gaskins also believed that Mr. Friel "perceived that confession in the same light." Specifically, Mr. Gaskins apparently believed that Mr. Friel saw the confession as incompatible with the principal defense theory and that Mr. Friel did not take the reported confession seriously.

The question, then, is whether Mr. Gaskins had an obligation imposed by the constitutional standard of effective assistance of counsel to make some inquiry into the confession reported to him by Mr. Friel, bearing in mind that it is at least Mr. Gaskins' testimony that he did not perceive that his client took the confession seriously.

We start from the self-evident proposition that information that a person other than the defendant had confessed to committing the alleged arson is exculpatory. The Government acknowledges that without question material appearing in a prosecutorial file reporting a confession by a person not a defendant would be material which would be delivered to defense counsel. *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

When such material is in the hands of defense counsel, as here it was by the defendant's own actions, what is defense counsel's professional obligation? The decision of our Court of Appeals in *United*

*States v. Baynes,* 687 F.2d 659, 668 (3d Cir.1982) (*Baynes II*), makes it clear that the obligation of counsel is "to inquire thoroughly into all potentially exculpatory defenses and evidence." In support of that statement of defense counsel's duty, the Court of Appeals in turn quoted from the American Bar Association Standards, The Defense Function, § 4.1 (1971), as follows: " 'It is the duty of the lawyer to conduct a prompt investigation of the circumstances of the case and explore *all* avenues leading to facts relevant to guilt and degree of guilt or penalty.' " 687 F.2d at 668 (emphasis added by Court of Appeals). That statement of the duty of the defense lawyer is characterized by the Court of Appeals as being

> a standard which is central to the successful functioning of our adversary system of criminal justice .... If our society is to retain its commitment to the non-unattainable ideal that each accused, however destitute, ignorant, or seemingly culpable, is entitled to a complete and vigorous defense, the courts must continue to insist that trial counsel, at the very least, investigate all substantial defenses available to a defendant.

687 F.2d at 668.

Now, we must ask ourselves whether the duty set forth by the Court of Appeals in *Baynes II* has been qualified by the authoritative language of the Supreme Court in *Strickland v. Washington,* —— U.S. ——, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). In that extensive opinion, the Court, through Justice O'Connor, spoke at some length about what is required of an attorney to fulfill the Sixth Amendment guarantee of assistance of counsel.

In surveying that broad ground, the Court wrote: "[a]s all the Federal Courts of Appeals have now held, the proper standard for attorney performance is that of reasonably effective assistance. See *Trapnell v. United States,* 725 F.2d [149] at 151–152." —— U.S. at ——, 104 S.Ct. at 2064. The reference by Justice O'Connor to *Trapnell* is to a case decided last year by the Court of Appeals for the Second

Circuit, *Trapnell v. United States*, 725 F.2d at 149 (2d Cir.1983). In that case, Chief Judge Feinberg made a major historical survey of the development in the federal courts over the last forty years of the standard of professional performance in the representation of a criminal defendant required by the Constitution. The occasion of Chief Judge Feinberg's decision was a final formal repudiation by the Second Circuit of a standard which had obtained in that circuit since 1949. In *United States v. Wight*, 176 F.2d 376, 379 (2d Cir.1949), *cert. denied*, 338 U.S. 950, 70 S.Ct. 478, 94 L.Ed. 586 (1950), that court stated that "[a] lack of effective assistance of counsel must be of such a kind as to shock the conscience of the court and make the proceedings a farce and mockery of justice."

As Chief Judge Feinberg pointed out in *Trapnell*, the Second Circuit's *Wight* standard reflected adoption by that court of a standard formulated by Judge Thurmond Arnold for the Court of Appeals for the District of Columbia Circuit in *Diggs v. Welch*, 148 F.2d 667, 670 (D.C.Cir.1945), *cert. denied*, 325 U.S. 889, 65 S.Ct. 1576, 89 L.Ed. 2002 (1945). The *Diggs* rule was followed by nine of the eleven circuits by 1962. Among the circuits following Judge Arnold's principle was our circuit in *In re Ernst*, 294 F.2d 556, 558 (3d Cir.1961), *cert. denied*, 368 U.S. 917, 82 S.Ct. 198, 7 L.Ed.2d 132 (1961).

In 1970, as Chief Judge Feinberg points out, the courts of appeals began to look in a very different direction. This started with the Court of Appeals for the Fifth Circuit's statement in *Caraway v. Beto*, 421 F.2d 636 (5th Cir.1970) (per curiam), that "[w]e interpret the right to counsel as the right to effective counsel. We interpret counsel to mean not errorless counsel, and not counsel judged ineffective by hindsight, but counsel reasonably likely to render *and rendering* reasonably effective assistance." 421 F.2d at 637 (quoting *MacKenna v. Ellis*, 280 F.2d 592, 599 (5th Cir. 1960) (with *MacKenna's* emphasis)). In the same year, 1970, our Court of Appeals as Judge Feinberg points out, "replaced the 'farce and mockery' standard with a stan-

dard of 'normal competency'." *Trapnell*, 725 F.2d at 151; *see Moore v. United States*, 432 F.2d 730, 737 (3d Cir.1970) (in banc). Since that time, one court of appeals after another has moved away from the standard announced in *Diggs v. Welch*, and accepted in *United States v. Wight* by the Second Circuit and subsequently by so many other circuits, to the standard of "reasonably effective assistance" adopted by the Fifth Circuit in 1970 and, essentially, conformed to by our own Court of Appeals that same year in *Moore v. United States*.

*Trapnell* last year was the occasion in which the Second Circuit formally overturned *United States v. Wight* and joined all the other courts of appeals in the new standard. That is the history which underlies Justice O'Connor's recital in *Strickland*, that "[a]s the Federal Courts of Appeals have now held, the proper standard for attorney performance is that of reasonably effective assistance. See *Trapnell v. United States*, 725 F.2d, at 151–52." —— U.S. at ——, 104 S.Ct. at 2064.

I have made that excursus in order to determine whether our Court of Appeals' explication of the obligation of counsel to investigate all possible lines of exculpation in *Baynes II*, which it reaffirmed in *Government of the Virgin Islands v. Bradshaw*, 726 F.2d 115 (3d Cir.1984), was consistent with the standard now approved by the Supreme Court in *Strickland*, or whether our Court of Appeals had moved to a higher plateau of strictness in monitoring the performance of defense counsel. I conclude that in *Baynes II* and *Bradshaw* our Court of Appeals pursued exactly the standard of effective assistance pursued by other courts of appeals and which the Supreme Court in *Strickland* has now authenticated.

The *Baynes II* court stated:

In *Moore v. United States*, 432 F.2d 730 (3d Cir.1970), this Court, sitting in banc, set forth the standard to be employed when evaluating ineffective assistance allegations. We held that an attorney,

not unlike any other professional, is required to exercise "the customary skill and knowledge which normally prevails at the time and place." *Id.* at 736. Necessarily, application of this standard entails a careful inquiry into the particular circumstances surrounding each case. . . .

687 F.2d at 665. The court then went on to quote the following from *United States v. Decoster,* 624 F.2d 196, 203 (D.C.Cir.1979) (in banc):

The defense attorney's function consists, in large part, of the application of professional judgment to an infinite variety of decisions in the development and prosecution of the case. A determination whether any given action or omission by counsel amounted to ineffective assistance cannot be divorced from consideration of the peculiar facts and circumstances that influenced counsel's judgment. In this factladen atmosphere, categorical rules are not appropriate.

*See also Bradshaw,* 726 F.2d at 120 (evaluating failure to insist on proper number of peremptory challenges in particular factual context).

The conformity of that approach initiated by our Court of Appeals in *Moore* in 1970, and culminating in *Baynes II* in 1983, with the approach taken by the Supreme Court in *Strickland,* is striking. In *Strickland,* Justice O'Connor took particular occasion to refer to the fact-based nature of the inquiry:

In any case presenting an effectiveness claim, the performance inquiry must be whether counsel's assistance was reasonable considering all the circumstances. Prevailing norms of practice as reflected in the American Bar Association standards and the like, *e.g.,* ABA Standards for Criminal Justice 4–1.1 to 4–8.6 (2d ed. 1980) ("The Defense Function"), are guides to determining what is reasonable, but they are only guides. No particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant. Any such set of rules would interfere with the constitutionally protected independence of counsel and restrict the wide latitude counsel must have in making tactical decisions. See *United States v. Decoster,* 624 F.2d at 208.

— U.S. at ——, 104 S.Ct. at 2065.

In short, the Supreme Court in *Strickland,* as did our Court of Appeals in *Baynes II,* referred to the ABA Standards with respect to the defense function as guides, but both courts insist that no categorical listing of particularized obligations of counsel can or should be profitably articulated. For these propositions both courts turn to the Court of Appeals for the District of Columbia Circuit's decision in *Decoster.*

*Strickland* does add an important ingredient to the *Baynes II* analysis. This ingredient is in no sense inconsistent with what is said in *Baynes II,* but the Supreme Court appropriately concluded that it needed explanation for the guidance of all courts of appeals and district courts. That added ingredient was the Supreme Court's concern that lower courts understand that a presumption of regularity attaches to the course pursued by defense counsel. "[T]he court should recognize that counsel is strongly presumed to have rendered adequate assistance and made all significance decisions in the exercise of reasonable professional judgment." — U.S. at ——, 104 S.Ct. at 2066.

After addressing the general problem of defining the obligation of defense counsel to provide "reasonably effective assistance," the Supreme Court in *Strickland* turned specifically to discuss the obligation of defense counsel to investigate. That, as the Supreme Court pointed out in *Strickland,* was "[t]he duty at issue in this case." — U.S. at ——, 104 S.Ct. at 2066. It was also the duty at issue in *Baynes II* and the duty at issue pursuant to Mr. Friel's application under section 2255.

The Supreme Court in *Strickland* had this to say:

As the Court of Appeals concluded, strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations necessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.

— U.S. at ——, 104 S.Ct. at 2066.

Then the Supreme Court went on to address the sort of inquiry which lies at the heart of our problem. The Court said, through Justice O'Connor:

The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions. Counsel's actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant. In particular, what investigation decisions are reasonable depends critically on such information. For example, when the facts that support a certain potential line of defense are generally known to counsel because of what the defendant has said, the need for further investigation may be considerably diminished or eliminated altogether. And when a defendant has given counsel reason to believe that pursuing certain investigations would be fruitless or even harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable. In short, inquiry into counsel's conversations with the defendant may be critical to a proper assessment of counsel's investigation decisions, just as it may be critical to a proper assessment of counsel's other litigation decisions.

*Id.* (citing *Decoster*).

I will turn now to consider the facts of this case, in light of the announced principles. Mr. Gaskins was told something about a confession by Mr. Friel. Mr. Gaskins' recollection, as he testified, was limited. He did not purport to have known the name of the purported confessant, except as that name appeared in documents submitted in connection with this section 2255 application. He did not appear on the witness stand during the evidentiary hearing on this section 2255 application to have any lively recollection of who it was that reported the confession to Mr. Friel. For example, Mr. Gaskins did not recognize the name "Benjamin Ward," when I asked about Mr. Ward.

Looking at the question of what Mr. Gaskins should have done, if anything, with the information which he remembers to have been given to him by Mr. Friel, can it be said that Mr. Gaskins did what was called for by *Baynes II* and by *Strickland?* And asking this question, I am putting the problem into the focus provided by Mr. Gaskins' recollection on the witness stand of what his perceptions were at the time of his conversation with Mr. Friel. I am not at this moment putting the question in the framework of what was called for if Mr. Friel's, rather than Mr. Gaskins', testimony is accepted with respect to what Mr. Friel advised Mr. Gaskins about the confession and its relevance to the preparation of the defense.

Taking Mr. Gaskins' view of things, he had been told that somebody reportedly had confessed and that that somebody was within the community to which I have previously referred which numbered among its members Mr. Friel, Mr. Lance, Mother Light and others. The report was seen by Mr. Gaskins as a rumor, and, at any event, inconsistent with the factual line of defense being pursued to demonstrate that the fire originated with an electrical fault in the freezer. Finally, Mr. Gaskins believed that Mr. Friel did not take the matter seriously.

The reference to the fact that the asserted declarant came from "that small community," is elusive. Possibly it connoted

some skepticism on Mr. Gaskins' part as to whether such a declarant, either in person or reported to others who evidently were perceived as coming from the same community, would be persuasive to a jury. This theme was not developed by Mr. Gaskins, so I can only speculate that that might have been a factor in his mind. Where that factor would take one seems most mysterious, since the community from which Mr. Gaskins was speaking produced not merely the defendants and their adherents, but also at least one major government witness.

That the confession was inconsistent with the proposition that the fire started in the freezer is indisputable. But if Mr. Gaskins had gotten the full flavor of the confession as reported in testimony here by Ms. Willis and Mr. Ward, he might have understood that the irreconcilability was not total; Mr. Brooks was reported to have acknowledged, perhaps even boasted, that he tried to cover up the arson by pouring water on the freezer to make it look as if that were the originating point of the conflagration.

If we assume that the two lines of inquiry into the Brooks confession and into the electrical fire necessarily led in diametrically opposite directions, would that be a sufficient ground for not finding out a little something about where the purported confession led? It would seem hard to make a reasoned judgment that not only were the two theories incompatible, but that the theory that the freezer was at fault was the theory which had to be pursued to the rejection of any other, without finding out whether there was any persuasive and competent evidence that would support another theory. Certainly, as an *a priori* matter, a confession by another person is a paradigmatic mode of exculpation.

In *Baynes II* the question was whether defense counsel should have compared a voice exemplar with the tape which was to be introduced in evidence. The Government asserted that the evidentiary tape contained the voice of the defendant, Mr. Trice. Mr. Trice's counsel did not compare the tape with the concededly authentic exemplar of Mr. Trice's voice. It was argued that that was a strategic judgment which Trice's counsel was entitled to make, and having made could not later be seized on as an ineffective assistance. The Court of Appeals rejected that view:

> Trice's attorney cannot be excused from examining the exemplar evidence under the circumstances here simply because he was of the opinion that it was indeed his client's voice on the telephone conversation intercepted by the authorities. In the final analysis, it is the responsibility of the jury, and not the defense counsel, to draw a conclusion of this sort.

687 F.2d at 667.

Even more pointedly, the Court of Appeals, quoting from *United States v. Baynes*, 622 F.2d 66, 69 (3d Cir.1980), stated that:

> [a]lthough the decision whether or not to utilize a particular item of evidence, may be a matter of trial strategy within the acceptable bounds of trial counsel's discretion, we believe the *failure to investigate* a critical source of potential exculpatory evidence may present a case of constitutionally defective representation.

*Baynes II*, 687 F.2d at 666 (*Baynes II*'s emphasis). So I think we cannot conclude that Mr. Gaskins was entitled not to explore at all the purported confession, simply on the ground that what little he heard about the confession made it sound like a rumor, and moreover a rumor inconsistent with the theory which up to that point was governing the defense.

The harder question is presented by Mr. Gaskins' assertion that he did not perceive that Mr. Friel took the matter seriously. Certainly, the language I have quoted from *Strickland* makes it clear that, in addition to the general presumption that defense counsel has done his job competently, defense counsel is particularly entitled to rely in making investigative decisions on the information given to him by his client. The client is usually, as in this instance, the principal source of counsel's information.

If counsel's perception was that Mr. Friel did not take the purported confession seriously, did that suffice to permit counsel also not to take the confession seriously, and drop his investigation at that point? It is my judgment that it is plausible for a defense lawyer who is told by his client of a report of a confession, but is advised by his client that the client doesn't see it as a hopeful line of inquiry, to conclude that he ought not as an initial matter devote much investigative energy and resources to pursuing what is quite likely to be an entirely unfruitful line of inquiry. But for an attorney to be advised by his client that the client has been informed by an informant, or two informants, that those informants have been the direct recipients of a confession, and then for the attorney not to look into the confession *at all* because he and his client think any investigation unlikely to lead to a viable defense, seems to me an attenuation of the obligation to pursue exculpatory lines of defense. Such an attenuation is incompatible with the Court of Appeals' focused inquiry into that duty in *Baynes II.*

Further, I do not think that Mr. Gaskins' total abstinence from inquiry can be defended by reference to what the Supreme Court said in *Strickland.* To be sure, the Court did say that when a defendant has given counsel reason to believe that pursuing certain investigations would be fruitless or even harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable. There is not an iota of evidence here that suggests that there could be anything harmful in an inquiry into the alleged Brooks confession except in the sense that an inquiry would consume time, energy and money. The inquiry might also yield information, or misinformation, incompatible with the adopted line of defense. Bearing in mind that, as the Court of Appeals made plain in *Baynes II,* a decision to investigate in no way portends a decision to use whatever information is turned up at the end of the investigation, there could not possibly be a reason for defense counsel to have concluded that to "pursue said investigations ...

could be harmful," within the meaning of *Strickland,* —— U.S. at ——, 104 S.Ct. at 2066.

■ Could it be said, however, that this situation falls within the simpler, more modest alternative postulated by the Court? "When a defendant has given counsel reason to believe that pursuing certain investigations would be fruitless ..., counsel's failure to pursue those investigations may not later be challenged as unreasonable." *Id.* To be sure, it is Mr. Gaskins' testimony that he did not perceive that Mr. Friel took the report seriously. When pressed as to the substance of what was communicated to him about the reported confession, Mr. Gaskins was candid to acknowledge that he really had no memory. He could recall his perception of his attitude about the substance, but not the substance itself. Should the whole matter rest then, insulating Mr. Gaskins' non-pursuit of the confession on the fact that it was, as Mr. Gaskins testified, his perception that his client did not take the matter seriously? I think not.

Consider Mr. Gaskins' understanding of the situation. This is not a circumstance in which information was provided to counsel by the Government, by counsel's hired investigator, or by a gratuitous volunteer which information counsel's client characterizes as a dry hole. This was a situation in which the initiative was concededly taken by the client to advise counsel of information of a hypothetically exculpatory nature. The fact, if it is to be taken as the fact, that the client accompanies that report with an acknowledgement that the lead looks like a long shot, would hardly add up to the covenant of anticipated fruitlessness made by client to counsel that would seem to be the focus of the Supreme Court's phrase in *Strickland.*

It is true that in the paragraph preceding what I have just been reading in *Strickland,* the Court said that "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable. And strategic

choices made after less than complete investigation are reasonable, precisely to the extent that reasonable professional judgments support the limitations on investigation." — U.S. at ——, 104 S.Ct. at 2066. The court's language was carefully tailored. "[S]trategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Id.*

In this case counsel did not make merely a "less than complete investigation," and then decide not to pursue the confession issue further. Counsel made no investigation. To that extent, the strategic choice that the confession could not, under any circumstances, be a helpful line for Mr. Friel's defense to pursue was not a reasoned choice, in the sense that the court contemplated in *Strickland.* "[C]ounsel has a duty to make a reasonable investigation or to make a reasonable decision that makes particular investigations unnecessary." *Id.* I judge that when a client advises counsel of reports of a confession, even where the client accompanies that report with no assertion of confidence that what is ultimately to be found will turn out to be substantial, counsel has, within the meaning of *Strickland* and *Baynes II,* an obligation to make at least enough of a minimal inquiry as to give counsel a reasoned basis for determining whether further inquiry is indicated or whether investigation should be cut off at that point in deference to counsel's obligations to pursue what may reasonably seem to be more fruitful lines of endeavor.

My analysis up to this point has taken as its predicate acquiescence in Mr. Gaskins' perception of what he was told by Mr. Friel and the attitudes of doubt with which Mr. Friel accompanied the report. As I have noted, Mr. Friel's account is a very different one. Before preferring Mr. Friel's account to Mr. Gaskins', one would be prudent to apply an enormous discount. Mr. Friel has obviously so very much at stake in being persuaded himself and, in turn, persuading the court, that his lawyer did too little.

Nonetheless, it is of importance to know that Mr. Friel's version, which is at odds with Mr. Gaskins' perception that Mr. Friel did not take the matter seriously, has some extrinsic corroboration. Mr. Friel testified that he passed on to Mr. Gaskins that Mr. Lance had advised Mr. Friel that Mr. Brooks had acknowledged responsibility for the fire to Ms. Willis. Mr. Friel also testified that he told Mr. Gaskins about Mr. Ward's report of a conversation with Mr. Brooks which was, in effect, a repetition of what Ms. Willis said Mr. Brooks had told her.

Indeed, Ms. Willis testified that she had herself reported to Mr. Ward about what Mr. Brooks had told her. Ms. Willis confirmed that she had tried to reach Mr. Friel and had reached Mr. Lance, who said he would advise Mr. Friel. Mr. Ward confirmed that he had spoken to Mr. Friel. He also said that he was requested to get in touch with Mr. Gaskins directly, with a view to telling Mr. Gaskins all about the Brooks confession. Mr. Ward testified further that he did phone Mr. Gaskins' office many times, left messages and was advised that Mr. Gaskins would get back to him. Mr. Ward testified that there was, in the event, no such return call. Mr. Friel testified that he told or requested Mr. Ward to get in touch with Mr. Gaskins. So, that aspect of Mr. Friel's testimony, which gives emphasis to Mr. Friel's report that he indeed was trying to make Mr. Gaskins see that he took the matter seriously, is confirmed by Mr. Ward's direct testimony that Mr. Ward asked to, and did in fact, undertake to get in touch with Mr. Gaskins.[1]

---

1. Mr. Ward's testimony is not important as showing independently that Mr. Gaskins failed to pursue messages which Mr. Gaskins received. We had no testimony whatsoever to show that Mr. Gaskins was ever advised of the messages from Mr. Ward. One may make presumptions that in a law office which is reasonably organized to render reasonably effective assistance such messages do not all get mislaid. But it would certainly be entirely inappropriate for this court to draw any inference that Mr. Gaskins received any of Mr. Ward's messages on

Mr. Ward's testimony, then, supports Mr. Friel's testimony that Mr. Friel took the matter of the Brooks confession seriously and wanted his lawyer to do so as well. My own intuition is that Mr. Friel did take the matter seriously and tried to communicate that to his attorney. Why do I say that is my intuition rather than a flat finding? My judgment, as a matter of human experience, is that it is most unlikely that a client would advise a lawyer of a report which had come to the client that another person had confessed, and would at the same time say to the lawyer that he did not think there was anything here. So I call it my intuition that Mr. Friel regarded the matter as something to be reported to his lawyer, and also that Mr. Friel expected his lawyer to make some inquiry.

It is my corollary intuition that Mr. Gaskins was himself persuaded that the report which he got from his client was insubstantial. Mr. Gaskins concluded that Brooks' confession was unlikely to be a promising line of inquiry. Mr. Gaskins thereupon persuaded himself that his client shared that perception.

That is my best judgment on this record of what in fact happened. It is, I think, consistent with the mode of trial preparation which Mr. Gaskins acknowledged. Mr. Gaskins took the view that it was not really up to him to go and find witnesses, with the exception of one woman, who Mr. Gaskins said he did go and look for:

It is quite clear that I never went out to seek out, to search out or to investigate or to determine or to find any witnesses. We developed—our strategy for the trial was that the place was accidently burned down by virtue of a defective ice box, and I was convinced that that was the fact. And I am still convinced that that was the fact.

Notes of Testimony of November 4, 1983, at 113. That, by Mr. Gaskins' own testimony, is the attitude with which he received the report of the confession, a report which was inconsistent with the theory that Mr. Gaskins was pursuing.

However, taking as my predicate acquiescence in Mr. Gaskins' testimony that he did not perceive that his own client took seriously the report which Mr. Friel was presenting to him, I conclude that even so Mr. Gaskins failed in his obligation to investigate a possible, if not probable, exculpatory line, in that he made no investigation whatsoever.

■ Having so concluded, I tender the question whether Mr. Friel has demonstrated prejudice from this non-investigation. *Strickland* announces a standard of prejudice. "The defendant must show that there is a reasonable probability that, but for counsel's own professional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." — U.S. at ——, 104 S.Ct. at 2068.

This standard is not the standard which has prevailed in this circuit under *Baynes II*. *Baynes II* applies what, in effect, is a "harmless error" standard. The *Baynes II* court put the standard as follows: "Trice need only demonstrate that his attorney's ineffectiveness was not harmless 'beyond a reasonable doubt.'" 687 F.2d at 671; *cf. Bradshaw*, 726 F.2d at 117–118 (proffered alibi witnesses' testimony "devoid of probative value" so not ineffective assistance to fail to investigate). That standard is no more. The *Strickland* standard really demands much more of a defendant. But how much more? Does the language of probability connote that a defendant must show that if the error of counsel had not been made, the probability is that a different result would have ensued? Must defendant show that it is more likely than not that there would not have been a guilty verdict?

Justice O'Connor made it plain that that is not the signification to be attached to the

---

the basis of the record before this court. Speculation about how a law office ought to operate cannot do the service of evidence.

reasonable probability standard. "We believe that a defendant need not show that counsel's deficient conduct more likely than not altered the outcome in the case." —— U.S. at ——, 104 S.Ct. at 2068. She points out that the "more-likely-than-not" standard has certain attractions but that it is not the standard which the Court accepts.

The Court accepted a burden which, though a substantial one, is a lesser one:

> Taking the unaffected findings as a given, and taking due account of the effect of the errors on the remaining findings, a court making the prejudice inquiry must ask if the defendant has met the burden of showing that the decision reached would reasonably likely have been different absent the errors.

—— U.S. at ——, 104 S.Ct. at 2069.

Suppose Mr. Gaskins had made inquiry. He would, it can be reasonably predicted, have adduced the testimony of Mr. Ward and Ms. Willis which was in fact given to this court on this section 2255 application. Would that testimony have met the requirement? The Government takes the position that the testimony would have been inadmissible and even if admissible, it would not have met the requirement.

 It is the Government's submission that the testimony of Ms. Willis and Mr. Ward about what Mr. Brooks allegedly said to each of them is classic hearsay. And so it is. It would be inadmissible for the truth of Mr. Brooks' assertions unless it satisfies some exception. The exception which suggests itself is Fed.R.Evid. 804(b)(3), a statement against interest.[2] Rule 804(b) governs statements by a declarant unavailable as a witness. There is, as of now, no question about Mr. Brooks' unavailability. His whereabouts have apparently not been known for approximately four years. But I will come back in a moment to the ques-

tion at what point Mr. Brooks became unavailable.

Proceeding on the assumption that at trial Mr. Brooks would have been unavailable, the question arises whether the reported statements fit as statements against interest and are sufficiently corroborated. See Fed.R.Evid. 804(b)(3). There can be no real doubt that these are statements which would subject Mr. Brooks to criminal liability. The question whether they were made under circumstances which attest to their trustworthiness is harder, but I think not so hard as to take them out of the Rule.

We can test the matter, perhaps, by what would clearly be uncorroborated and, in the nature of things, unsusceptible of corroboration. Judge Weinstein gives the example of undisputed proof "that the person confessing to a shooting could not have been at the scene of a crime because he was in prison...." 4 J. Weinstein & M. Berger, *Weinstein's Evidence* ¶ 804(b)(3)[03] at p. 804–105 (1981).

Now, in this instance we have some corroboration in the fact that Mr. Brooks was reported to have made the same statement separately to two different auditors. Furthermore, to the extent that the statement can carry its own corroboration, though that has a certain bootstrapping implication, the statement attributed to Mr. Brooks is one which not merely describes the crime, but gives it a rationale, namely, hostility to Mr. Friel for discharge. There appears no independent reason to doubt the assertion that Mr. Brooks was discharged by Mr. Friel. So I conclude that sufficient corroboration was available so as to make these recitals admissible under Rule 804(b)(3), albeit with appropriate caveats to the jury.

If the Willis and Ward testimony were all, could one conclude that the standard set by the court in *Strickland* of reason-

---

**2.** Rule 804(b)(3) authorizes admission of:

A statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject him to civil or criminal liability, or to render invalid a claim by him against another, that a reasonable man in his position would not have made the statement unless he believed it to be true. A statement tending to expose the declarant to criminal liability and offered to exculpate the accused is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement.

able probability had been met? In making the prejudice inquiry, a court must ask if the defendant has met the burden of showing that the decision reached would reasonably likely have been different absent the errors.

In the nature of things, answering that question is an exercise in prophecy in the subjunctive which is an inordinately difficult one, and one which ultimately must be recognized as not yielding to precision as the bottom line. If the test were the one rejected by the Court in *Strickland*, the more-likely-than-not test, I would be satisfied, though not easily, that a conscientious answer is that it is not more likely than not that testimony by Ward and Willis with respect to Brooks' recital would have yielded a verdict of acquittal. But when the question is posed in the form that is authenticated in *Strickland*, I conclude that there is a reasonable likelihood, albeit less than a quantifiable probability, that a jury listening to testimony that an absent person had twice acknowledged culpability and had given a reason for the offense would have concluded that the Government had not proved its case against Mr. Friel beyond a reasonable doubt.

With respect to the particular jury that tried this case, the care with which they approached the matter was reflected in their rendering a verdict of acquittal with respect to Mr. Lance, Mr. Friel's co-defendant. If the case against Mr. Friel had been diluted by the admission into evidence of the Ward and Willis testimony, I conclude that there is a reasonable likelihood that the jury would have acquitted Mr. Friel.[3] I do not conclude that there is a quantifiable probability that the jury would have reached a different verdict, but only the reasonable likelihood called for by *Strickland*.

Now, I have put the question on the assumption that all that a prompt and efficient investigation carried out in preliminary fashion would have fetched up would have been the testimony of Mr. Ward and Ms. Willis. I have found that both Mr. Ward and Ms. Willis had immediately reported to Mr. Friel and Mr. Lance, respectively, what they had been advised by Mr. Brooks, so they said, and I have found that Mr. Ward repeatedly called Mr. Gaskins' office. There is no basis for concluding that there would have been any difficulty finding either of these persons, and getting their potential testimony into the defense file forthwith. But it must be pointed out that the prompt inquiry which, in my judgment, Mr. Gaskins should have at least initially commenced, might perhaps have yielded Mr. Brooks, as well.

Whether Mr. Brooks' testimony, if Mr. Brooks were found, would have been helpful is, of course, at this point wholly speculative. But we must proceed with what limited resources we have, and at the moment what we have are the concurrent statements of two witnesses. And this court has heard that Mr. Brooks spoke to them in terms which were directly exculpatory of this defendant. The burden of investigation, which *Baynes II* calls for, and which I think *Strickland* incorporates, is a burden to search with no guarantee that the avenue of exculpation will prove fruitful, as I pointed out before. The *Baynes II* court was at pains to explain that a decision to investigate carried with it no decision to use what was ultimately found. *Baynes II*, 687 F.2d at 666.

I say that a prompt investigation might have yielded Mr. Brooks in person with the possibility, of course, of enormously strengthening the defense. We know that Mr. Brooks disappeared. Was he gone by the time Mr. Ward and Ms. Willis reported

---

**3.** A finding of prejudice ought not turn exclusively on the particular characteristics of the individual fact-finder. *Strickland*, — U.S. at —, 104 S.Ct. at 2068. However, my finding here does not reflect any intuition concerning the original *Friel* jury's idiosyncracies. To the contrary, that jury behaved as I would have expected a reasonable jury to have acted according to law. Thus, my observation concerning the actual result reached at trial merely buttresses my independent conclusion that a reasonable likelihood exists that a jury would have reached a verdict of not guilty upon hearing the Willis and Ward testimony.

to Mr. Friel and Mr. Lance, and Mr. Friel in turn reported to Mr. Gaskins? The evident answer is no.

Ms. Willis testified that she called Mr. Friel but reached Mr. Lance, and indeed also Mr. Ward, either the night of her conversation with Mr. Brooks or the next morning. Notes of Testimony of October 6, 1983, at 72. Ms. Willis had also testified as follows on examination by Mr. Shmuckler:

Q. I think you said the last time you saw Brooks was in '79?

A. Yes.

Q. How—

A. '79, maybe January or February of '80.

Q. How long after this conversation?

A. What, did I speak with him?

Q. Yes.

A. He stayed there for about another month and then I kicked him out because I found out he was stealing.

*Id.* On recross by Mr. Bronson, Ms. Willis qualified that testimony a little bit. Mr. Bronson inquired:

Q. After he told you that he burned down the building, did you ask him to leave then?

A. No. I asked him to leave about a week, two weeks after that because I found out he had been stealing.

*Id.*

That, of course, leaves it ambiguous whether Mr. Brooks left a week or two weeks after the conversation or was asked to leave a week or two weeks after the conversation but did not leave for a month. But on either assumption there was a period of time within which it would seem Mr. Brooks could have been found by an investigator of ordinary competence and diligence.

In that alternate scenario, of course, what Mr. Brooks would have said to an investigator or to Mr. Gaskins himself might well have vindicated Mr. Gaskins' expectation that nothing was to be found there. On the other hand, it might have

effectively undercut the Government's case in its entirety. It cannot be the requirement of *Strickland* that a court on a section 2255 application must make a determination as to what success the investigation not pursued would have had; indeed, any such requirement flies in the face, so it seems to me, of the rationale of *Baynes II* and of *Strickland.*

For the reasons which I have recited at such considerable length, I conclude that Mr. Gaskins' failure to make any inquiry into the purported confessions was a failure to pursue an exculpatory possibility which constituted a failure to afford Mr. Friel the reasonably effective assistance of counsel. I further conclude that the failure is one which Mr. Friel has demonstrated resulted in prejudice, in the sense that "the defendant has met the burden of showing that the decision reached would reasonably likely have been different absent the errors." *Strickland,* —— U.S. at ——, 104 S.Ct. at 2069.

So for these reasons I am vacating Mr. Friel's conviction and sentence, and the matter will be set promptly for retrial.