PEOPLE v BARRERA
PEOPLE v MUSALL

Docket Nos. 98663, 98683. Argued November 7, 1995 (Calendar Nos. 2-3).
    Decided May 7, 1996.

Mark Barrera, Patrick M. Musall, and Fred Johnson were tried jointly
    before three separate juries in the Detroit Recorder's Court, Gersh-
    win A. Drain, J., for the stabbing-murder of a part-time prostitute.
    Barrera and Musall were convicted of first-degree felony murder,
    and were sentenced to life in prison without parole. Johnson was
    acquitted. Another codefendant, Matthew Copeland, was tried sepa-
    rately and was convicted by a jury of first-degree premeditated
    murder. The Court of Appeals, SAWYER, P.J., and WEAVER and H. R.
    GAGE, JJ., affirmed the convictions of Barrera and Musall in an
    unpublished opinion per curiam, holding that there were insuffi-
    cient corroborating circumstances to support admission, as excul-
    patory evidence, of Copeland's statement that he spontaneously
    acted alone in stabbing the victim (Docket Nos. 119344, 146673).

    In an opinion by Justice CAVANAGH, joined by Chief Justice
BRICKLEY, and Justices LEVIN, RILEY, and MALLETT, the Supreme Court
held:

    The trial court erred in excluding the statement of codefendant
Copeland offered by the defendants as exculpatory evidence, and
the error was not harmless.

    1. In determining whether a statement against a declarant's penal
interest may be admitted as exculpatory evidence, the trial court
must conscientiously consider the relationship between MRE
804(b)(3) and the defendant's constitutional due process right to
present exculpatory evidence. In determining on appeal whether
the trial court abused its discretion in excluding such evidence, the
appellate court must review the importance of the statement to the
defense theory.

    2. MRE 804(b)(3) requires that a statement against penal inter-
est, at the time of its making, must have so far tended to subject
the declarant to criminal liability that a reasonable person in the
declarant's position would not have made the statement unless
believing it to be true. "Tending to subject" includes a broad scope
of inculpatory statements, and encompasses disserving statements

by a declarant that would have probative value in a trial against the declarant or those that would intensify culpability. The statement need not have been incriminating on its face, as long as it was self-incriminating when viewed in context. In order to be probative of guilt, it must be against the declarant's interest in a real and tangible way; it cannot be a statement merely exculpating the accused.

3. MRE 804(b)(3) further requires that the exculpatory statement be trustworthy. It must have been made by the declarant, and it must afford a basis for believing the truth of the matter asserted. Under the totality of the circumstances, the trial court should consider the contents of the statement itself, the circumstances surrounding the making of the statement, and all other relevant facts. Where the statement was made to the authorities while the declarant was in custody, the court should consider the relationship between the confessing party and the exculpated party, whether the confessor made a voluntary statement after being advised of *Miranda* rights, and whether there is any evidence that the statement was made to curry the favor of the authorities.

4. A defendant's constitutional right to present exculpatory evidence in defense and the rationale and purpose underlying MRE 804(b)(3) of ensuring admission of reliable evidence must balance. The more crucial the statement to the defense theory, the less corroboration the court may constitutionally require for admission. The more remote or tangential a statement is to the defense theory, the more likely other factors can be interjected to weigh against its admission. There can be no bright-line rule; rather, resolution must be case by case.

5. Copeland's custodial statement admitting to stabbing the victim in fact was made after he had been advised of his *Miranda* rights. He expressly stated that he had not been promised anything to make the statement. Nothing would suggest that he was promised a deal or that he would not face full punishment. Indeed, he later was convicted of first-degree premeditated murder, largely on the basis of the statement. A reasonable person in his position would have realized that such admissions could implicate him in the crime. In both *Barrera* and *Musall*, the trial court abused its discretion in excluding Copeland's statement, and the error was not harmless.

Reversed and remanded for new trials.

Justice BOYLE, dissenting, stated that the defendants have failed to establish that Copeland's statement fulfills the requirements of MRE 804(b)(3) or that it was sufficiently reliable that its exclusion denied them the constitutional right of due process.

Nothing in the constitution or MRE 804(b)(3) compels the admission of Copeland's statement, and the trial court properly suppressed it. The jury in each case learned of Copeland's causative act through other evidence. What was contained in the statement that the juries did not know was denial and disavowal. The conclusion that the statement is self-incriminating to the degree that a reasonable person would not have said it unless it were true clearly is not warranted. The statement was not truly inculpatory. The statements regarding the defendants were neutral or self-serving and were not exculpatory of them. There are insufficient, corroborating circumstances that clearly indicate the trustworthiness of Copeland's statement.

The test for admissibility under MRE 804(b)(3) is not whether a statement would be probative in the declarant's trial. Nor is admissibility determined by how crucial the statement is to the defendant's theory. While the importance of the evidence in relation to the theory of defense is critical to a claimed due process violation, the foundation of the exception is circumstances indicating trustworthiness. The preliminary question of admissibility clearly cannot turn on rote application of the hearsay rule. Just as clearly, necessity does not determine admissibility. Correctly understood, due process requires the state to put reliable third-party statements before the jury, despite the hearsay rule. Due process does not guarantee the use of unreliable evidence, provided it is crucial.

Justice WEAVER took no part in the decision of this case.

*Frank J. Kelley*, Attorney General, *Thomas L. Casey*, Solicitor General, *John D. O'Hair*, Prosecuting Attorney, *Timothy A. Baughman*, Chief, Research, Training and Appeals, and *Joseph A. Puleo*, Assistant Prosecuting Attorney, for the people.

*Arthur J. Tarnow* for defendant Barrera.

State Appellate Defender (by *Debra A. Gutierrez*) for defendant Musall.

CAVANAGH, J. The issue presented in this consolidated appeal is whether the trial court erroneously excluded a statement by a codefendant that was offered by the instant defendants as exculpatory evidence. We hold that the trial court erred and that the

error was not harmless. We reverse the Court of
Appeals, vacate the convictions, and remand for new
trials.

I

Codefendants Mark Barrera, Fred Johnson, and
Patrick (Mike) Musall were prosecuted in a consoli-
dated trial before three separate juries for the murder
of Deborah Haynes.[1] Another defendant, Matthew
Copeland, was tried in a separate trial. The undis-
puted facts were that the victim was stabbed to death
during the night of October 27, 1988, or in the early
morning hours of October 28, 1988, in Balduck Park
in Detroit. The victim was a part-time prostitute. The
next morning, a passerby discovered the mostly nude
body of the victim and the police were notified. The
police discovered several items of clothing strewn
about the area. An autopsy revealed that the victim
had died of multiple stab wounds.

At first, the police investigation focused on the vic-
tim's live-in boyfriend who was also her pimp. Within
a week, the investigation turned to the four defend-
ants. During the course of the night of November 3,
1988, and into the early morning hours of Novem-
ber 4, 1988, all four defendants gave written state-

---

[1] They were originally charged with first-degree felony murder during
alleged criminal sexual conduct, and first-degree premeditated murder,
MCL 750.316; MSA 28.548. At a preliminary examination on Novem-
ber 17, 1988, the prosecution was allowed to amend the felony-murder
count to include larceny and to add charges of first-degree criminal sexual
conduct (penetration during another felony or penetration with the use of
force), MCL 750.520b; MSA 28.788(2) and armed robbery, MCL 750.529;
MSA 28.797. On January 27, 1989, the trial court quashed the criminal
sexual conduct count because of the corpus delicti rule and quashed the
armed-robbery count because there was insufficient evidence independent
of the defendants' statements that there was a taking of the victim's prop-
erty or that any taking was armed.

ments to the police. They revealed that they had been driving around in Barrera's car on October 27, 1988, and had picked up the victim. The four stated that they negotiated with her for sex. They proceeded to the park. All four further stated that Copeland did have oral sex with her and each defendant identified Copeland as the sole stabber. There were several additional facts that were in dispute, which will be discussed later in this opinion.

Each defendant's statement was used by the prosecution against him in the respective prosecutions.[2] Barrera, Musall, and Johnson called Copeland to testify at the consolidated trial. After Copeland asserted his Fifth Amendment right not to testify, Barrera, Musall, and Johnson each sought to use Copeland's statement for exculpatory purposes under MRE 804(b)(3).

Copeland alleged in his statement that the victim also had oral sex with Musall. Copeland admitted that he was acting under the influence of mescaline and alcohol, and that he began to believe that the victim was "Spooner," his former girlfriend. He stated that he had previously caught his girlfriend having sex with someone else and that he had threatened to kill her if he caught her again. Copeland stated that while watching the victim and Musall having oral sex, he told the victim that he was going to kill her, and then he pulled a knife out of his sleeve and stabbed her.

The trial court refused to allow admission of Copeland's statement because it found that the statement was not against Copeland's penal interest and that

---

[2] Barrera's statement was redacted to remove irrelevant and potentially prejudicial questions and answers.

there was insufficient corroborating evidence of Copeland's statement. Barrera and Musall were convicted of first-degree felony murder by their respective juries and were sentenced accordingly to mandatory life in prison without parole. Johnson was acquitted by his jury. In a subsequent trial, Copeland was convicted by a jury of first-degree premeditated murder and was sentenced to mandatory life without parole.

The Court of Appeals affirmed the convictions of Barrera and Musall.[3] We granted leave to appeal limited to the issue whether the trial court abused its discretion in denying the request of the two defendants to admit Copeland's confession. 448 Mich 868 (1995).

II

At issue is the admissibility of Copeland's out-of-court statement, which Barrera and Musall proffered to prove the truth it asserted: that Copeland spontaneously acted alone in stabbing the victim. The defendants maintain that this hearsay statement falls within MRE 804(b)(3), the statement against penal interest exception to the hearsay rule.[4] They additionally argue that exclusion of this evidence violated their federal due process right to present witnesses in their defense. *Chambers v Mississippi*, 410 US 284, 302; 93 S Ct 1038; 35 L Ed 2d 297 (1973); *Washington v Texas*, 388 US 14, 19; 87 S Ct 1920; 18 L Ed 2d 1019 (1967).

---

[3] Unpublished opinion per curiam, issued January 5, 1994 (Docket Nos. 119344, 146673).

[4] MRE 802 provides that "Hearsay is not admissible except as provided by these rules."

MRE 804(b) provides that if a declarant is unavailable, as defined in MRE 804(a), his out-of-court statement against interest may avoid the hearsay rule if certain thresholds are met:

> A statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject the declarant to civil or criminal liability, or to render invalid a claim by the declarant against another, that a reasonable person in the declarant's position would not have made the statement unless believing it to be true. A statement tending to expose the declarant to criminal liability and offered to exculpate the accused is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement.

We have previously considered MRE 804(b)(3) from the reverse position: where the prosecution seeks to use a statement against penal interest to *inculpate* a defendant. *People v Poole*, 444 Mich 151; 506 NW2d 505 (1993); *People v Watkins*, 438 Mich 627; 475 NW2d 727 (1991). Although many of the separate opinions in *Poole* and *Watkins* speculated about the requirements for use of a statement against penal interest to *exculpate* the defendant, we are now required to address the relevant issues.

MRE 804(b)(3) is modeled after its Federal Evidentiary Rule 804(b)(3).[5] Accordingly, we can look to federal precedent for guidance. *Poole*, 444 Mich 160-162.

---

[5] MRE 804(b)(3) is identical except that the phrase "reasonable person" is used instead of "reasonable man."

III

A. STANDARD OF REVIEW

We must first determine the appropriate standard of review for evaluating a trial court's decision to exclude a statement against penal interest offered under MRE 804(b)(3)   to exculpate a defendant. Although many federal courts have tersely stated that the standard of review is abuse of discretion,[6] we find that there are four subissues that may be presented on review: (1) whether the declarant was unavailable, (2) whether the statement was against penal interest, (3) whether a reasonable person in the declarant's position would have believed the statement to be true, and (4) whether corroborating circumstances clearly indicated the trustworthiness of the statement.

In the instant cases, we need not address the standard of review of a trial court's determination whether the declarant was unavailable at trial, because the prosecutor concedes that Copeland, who invoked his right not to testify, was unavailable. We find that the determination whether a "statement was against the declarant's penal interest presented a question of law." United States v Bagley, 537 F2d 162, 165-166 (CA 5, 1976).   Therefore, appellate review is de novo. See United States v Arthur, 949 F2d 211, 216 (CA 6, 1991)   (no deference to the trial court's determination).

We further find that the determination whether a reasonable person in the declarant's shoes would

[6] E.g., United States v Noel, 938 F2d 685, 688 (CA 6, 1991). We find that the federal cases that were required to separately address the standard of review with respect to the separate elements to be more persuasive than those cases simply stating a rule.

have believed the statement to be true and the determination whether circumstances sufficiently indicated the trustworthiness of the statement depend in part on the trial court's findings of fact and in part on its application of the legal standard to those facts. *Bagley*, 537 F2d 166. Accordingly, like many federal courts, we will use a clearly erroneous standard in reviewing the trial court's findings of fact and an abuse of discretion standard in reviewing the trial court's decision to exclude the evidence.[7]

In exercising its discretion, the trial court must conscientiously consider the relationship between MRE 804(b)(3) and a defendant's constitutional due process right to present exculpatory evidence. See *United States v Barrett*, 539 F2d 244, 253 (CA 1, 1976). Likewise, appellate review necessarily requires a review of the importance of the statement to the defendant's theory of defense in determining whether the trial court abused its discretion by excluding the evidence.

### B. AGAINST PENAL INTEREST

The next issue is the extent to which the declarant's statement must be against his penal interests, as defined by MRE 804(b)(3). That rule requires that the

---

[7] E.g., *United States v Fowlie*, 24 F3d 1059, 1068 (CA 9, 1994) (the reasonable person requirement was reviewed for abuse of discretion); *United States v Garcia*, 986 F2d 1135, 1139 (CA 7, 1993) (the only issue involved the corroborating circumstances requirement under FRE 804[b][3], review was under the clearly erroneous standard); *Noel*, n 6 *supra* 688 (a determination that the statement was not sufficiently corroborated "was not clearly erroneous"). Cf. *United States v Thomas*, 62 F3d 1332, 1336 (CA 11, 1995): "Questions of law and questions of the application of the law to the facts receive *de novo* review, while a trial court's findings of fact are reviewed under the clearly erroneous standard." (Citation omitted.)

"statement . . . at the time of its making . . . so far *tended* to subject the declarant to . . . criminal liability, . . . that a reasonable person in the declarant's position would not have made the statement unless believing it to be true." (Emphasis added.)[8] After reviewing federal cases that have applied the actual language enacted by Congress, we believe that the phrase "tended to subject" includes a broad scope of inculpatory statements. See, e.g., *United States v Satterfield*, 572 F2d 687, 691 (CA 9, 1978) (in enacting FRE 804[b][3], Congress rejected a restrictive approach by choosing the phrase "tended to subject").

Federal case law has developed some general parameters that can guide our determination when a statement sufficiently "tended to subject" the declarant to criminal liability. First, the mere fact that the declarant invoked his Fifth Amendment right not to testify does not make the statement against penal interest. *United States v Thomas*, 62 F3d 1332, 1338 (CA 11, 1995). On the other hand, statements against penal interest are not limited to direct confessions. *United States v Slaughter*, 891 F2d 691, 698 (CA 9, 1989); *Barrett*, 539 F2d 251 (it is sufficient if the statement would be "important evidence" against the declarant). Moreover, it is well established that a par-

---

[8] The prosecutor urges us to alter the express language of the rule and require the statement to be "so far *contrary*" to penal interest, to parallel the corresponding provisions for statements against pecuniary and proprietary interests. The prosecutor relies on *United States v Bahadar*, 954 F2d 821, 828 (CA 2, 1992). We reject such a reading of MRE 804(b)(3) in light of the actual language used in the rule, which suggests a broader interpretation of statements against civil or penal interest than statements against pecuniary or proprietary interest. MRE 804(b)(3) only requires that the statement "so far *tended* to subject" the declarant to criminal liability. (Emphasis added.) See *Poole*, 444 Mich 159 ("tended to subject").

ticular piece of evidence need not by itself prove the declarant guilty. The proffered statement need only be "a brick in the wall" of proving the declarant's guilt. MRE 804(b)(3), like its federal counterpart, "encompasses disserving statements by a declarant that would have probative value in a trial against the declarant." *United States v Thomas*, 571 F2d 285, 288 (CA 5, 1978).[9] By the same token, the statement would be against the declarant's penal interest if it intensified his culpability, such as by shifting criminal liability away from the accused and toward the declarant. *United States v Lopez*, 777 F2d 543, 554 (CA 10, 1985). Furthermore, the statement need not have been incriminating on its face, as long as it was self-incriminating when viewed in context. *Williamson v United States*, 512 US 594, ___; 114 S Ct 2431, 2436-2437; 129 L Ed 2d 476 (1994).

However, in order to be probative of the declarant's guilt, the statement must be against the declarant's interest in "a real and tangible way." *Arthur*, 949 F2d 216. It must actually assert the declarant's own culpability to some degree—it cannot be a statement merely exculpating the accused. *United States v Oropeza*, 564 F2d 316, 325 (CA 9, 1977).

Furthermore, as required by MRE 804(b)(3), a reasonable person in the declarant's shoes must have realized that the statement could implicate the declarant in a crime. *Williamson*, 114 S Ct 2437. This flows from the underlying rationale of the exception: the statement's reliability flows from the postulate that a reasonable person will not incriminate himself by

---

[9] "A statement may satisfy this requirement if it would be probative at trial against the declarant." *United States v Nagib*, 56 F3d 798, 804 (CA 7, 1995) (citation omitted).

admitting a damaging fact unless he believes that fact to be true. See 4 Weinstein & Berger, Evidence, ¶ 804(b)(3)[01], p 804-138. If the declarant faces no reasonable threat of punishment, the justification underlying the exception would not be met. *United States v Fowlie*, 24 F3d 1059, 1068 (CA 9, 1994) (a statement made by a declarant while out of the country and facing no threat of punishment would not be against penal interest).

In short, whether a declarant's statement was sufficiently against penal interest is whether the statement would be probative of an element of a crime in a trial against the declarant, and whether a reasonable person in the declarant's position would have realized the statement's incriminating element. If so, then the statement tended to subject the declarant to criminal liability.

### C. TRUSTWORTHINESS OF THE STATEMENT

Beyond the requirement that a statement must be against penal interest, MRE 804(b)(3) further requires that exculpatory statements must be trustworthy. We note that the rule "does not require that the statements themselves be clearly corroborated." *United States v Garcia*, 986 F2d 1135, 1141 (CA 7, 1993). We make a further preliminary observation that federal courts are split over whether the court must assess the credibility of the witness,[10] or of the declarant, or of only the statement.[11] We believe that

---

[10] This is not an issue in this case because Copeland's statement is in writing. However, we agree with *Satterfield*, 572 F2d 691-692, that, *in general*, assessing the credibility of the testifying witness is a function of the jury.

[11] Compare *United States v Salvador*, 820 F2d 558, 561-562 (CA 2, 1987) (corroboration of both the declarant's trustworthiness and of the state-

the credibility of the declarant inherently affects the trustworthiness of the statement, and therefore it is not inappropriate for a court to exclude a statement where the declarant's veracity is seriously doubtful or entirely lacking. *United States v Moore*, 936 F2d 1508, 1517 (CA 7, 1991); *United States v MacDonald*, 688 F2d 224, 233 (CA 4, 1982); *Satterfield*, 572 F2d 692.

Therefore, we are faced with two remaining questions respecting the corroborating circumstances requirement: (1) what facts may a judge properly consider, and (2) what level of corroboration is necessary?

### APPROPRIATE FACTORS

There is no clear rule in the federal cases regarding which factors should be considered.[12] Fundamentally, the determination of trustworthiness invokes "two

---

ment's trustworthiness was required), with *United States v Brainard*, 690 F2d 1117, 1124 (CA 4, 1982): "The rule requires not a determination that the declarant is credible, but a finding that the circumstances clearly indicate that the statement was not fabricated."

[12] Some federal courts have used a general four-factor test based on *Chambers*. E.g., *Oropeza*, 564 F2d 325. The "*Chambers*" factors are:

(a) the time of the declaration and the party to whom it was made;

(b) the existence of corroborating evidence;

(c) the extent to which the declaration is really against the declarant's penal interest; and

(d) the availability of the declarant as a witness. [Citations omitted.]

*Chambers* did not involve FRE 804(b)(3), which already addresses three of the factors. Consequently, one can surmise that this test has questionable usefulness.

Other courts have used an ad hoc test, considering the facts presented in the case. *Noel*, 938 F2d 688-689; *Salvador*, 820 F2d 562; *Lopez*, 777 F2d 554; *Brainard*, n 11 *supra* at 1125; *Satterfield*, 572 F2d 693.

distinct elements. . . . [T]he statement must actually have been made by the declarant, and it must afford a basis for believing the truth of the matter asserted." *Bagley*, 537 F2d 167.

We also note that MRE 104(a) provides that, in determining the admissibility of evidence, the trial court generally "is not bound by the Rules of Evidence," which supports a broad scope of permissible considerations. Although the defendant's statement may often be self-serving, we believe that the trial court may consider it as a factor of corroboration if appropriate. *Slaughter*, 891 F2d 698.

In *Poole*, a majority of this Court adopted a totality-of-the-circumstances test and listed eight nonexclusive factors to consider in determining whether a statement against penal interest was sufficiently reliable to be used to *inculpate* the defendant without violating his constitutional right of cross-examination. *Poole*, 444 Mich 165. The majority explained:

In evaluating whether a statement against penal interest that inculpates a person in addition to the declarant bears sufficient indicia of reliability to allow it to be admitted as substantive evidence against the other person, courts must evaluate the circumstances surrounding the making of the statement as well as its content.

The presence of the following factors would favor admission of such a statement: whether the statement was (1) voluntarily given, (2) made contemporaneously with the events referenced, (3) made to family, friends, colleagues, or confederates—that is, to someone to whom the declarant would likely speak the truth, and (4) uttered spontaneously at the initiation of the declarant and without prompting or inquiry by the listener.

On the other hand, the presence of the following factors would favor a finding of inadmissibility: whether the statement (1) was made to law enforcement officers or at the

prompting or inquiry of the listener, (2) minimizes the role
or responsibility of the declarant or shifts blame to the
accomplice, (3) was made to avenge the declarant or to
curry favor, and (4) whether the declarant had a motive to
lie or distort the truth. [*Id.*]

*Poole* also directed courts to consider any other rele-
vant factor in the case in order to analyze whether,
under the totality of the circumstances, the statement
was sufficiently reliable. *Id.*

With respect to custodial statements, we find useful
the three-factor inquiry developed by the United
States Court of Appeals for the Seventh Circuit.
*United States v Garcia*, 986 F2d 1140. Under that
test, the court should first consider "the relationship
between the confessing party and the exculpated
party and . . . [whether] it was likely that the con-
fessor was fabricating his story for the benefit of a
friend. Thus, if the two involved parties do not have a
close relationship, one important corroborating cir-
cumstance exists." *Id.* (citation omitted).[13] The sec-
ond factor is "whether the confessor made a volun-
tary statement after being advised of his *Miranda*
rights." *United States v Nagib*, 56 F3d 798, 805 (CA 7,
1995), citing *Garcia*, 986 F2d 1140. The third, is
"whether there is any evidence that the statement
was made in order to curry favor with authorities."
*Id.*

In sum, we believe that the totality-of-the-circum-
stances test adopted in *Poole*, 444 Mich 165, may be
applied in the instant context. It requires the trial
court to consider the contents of the statement itself,

---

[13] See *United States v Tovar*, 687 F2d 1210, 1213 (CA 8, 1982) (the
declarant was helping out "a friend for whom he felt responsible").

the circumstances surrounding the declarant making the statement, and all other relevant facts in the case. In addition, where the statement was made to the authorities while the declarant was in custody, the trial court should consider the three-factor inquiry.

### EXTENT OF CORROBORATION

Perhaps the consideration with the greatest range of divergent views is the level of corroboration that should be required with respect to exculpatory statements against penal interest. Defendant Musall asks us to adopt the threshold suggested in Weinstein:

> The court should only ask for sufficient corroboration to "clearly" permit a reasonable man to believe that the statement might have been made in good faith and that it could be true. If, for example, the proof is undisputed that the person confessing to a shooting could not have been at the scene of the crime because he was in prison, it will be excluded. But if there is evidence that he was near the scene and had some motive or background connecting him with the crime that should suffice. [Weinstein, ¶ 804(b)(3)[03], pp 804-154 to 804-155.]

In contrast, the prosecutor argues for a higher standard, contending that it is legally insufficient for a defendant to offer his own statement as the only corroborating circumstance for the declarant's statement.

For guidance, we turn to the legislative history of FRE 804(b)(3) for assistance in ascertaining Congress' intent.[14] The abbreviated version of the evolution of FRE 804(b)(3) is that the United States

---

[14] For general background information see 10 Moore, Federal Practice (2d ed), Introduction, § 1-2, pp 4-13 (general introduction), § 55, pp 83-84 (chronology of the Federal Rules of Evidence), and § 56, pp 85-86 (use of background materials).

Supreme Court proposed rules of evidence, which in turn went through various changes in the House of Representatives and the Senate before final enactment. For our purposes, important changes occurred with respect to the corroboration requirement. The Supreme Court's version of what became FRE 804(b)(3) provided: "A statement tending to exculpate the accused is not admissible unless *corroborated.*" 11 Moore, Federal Practice (2d ed), § 804.01[12.-2], p VIII-230 (emphasis added). The House of Representatives revised and subsequently enacted this sentence, deleting "corroborated" and adding "corroborating circumstances clearly indicate the trustworthiness of the statement." *Id.* The House Committee Report stated in relevant part:

> As for statements against penal interest, the [House] Committee shared the view of the Court that some such statements do possess adequate assurances of reliability and should be admissible. It believed, however, as did the Court, that statements of this type tending to exculpate the accused are more suspect and so should have their admissibility conditioned upon some further provision insuring trustworthiness. The proposal in the Court Rule to add a requirement of simple corroboration was, however, deemed ineffective to accomplish this purpose since the accused's own testimony might suffice while not necessarily increasing the reliability of the hearsay statement. The Committee settled upon the language "unless corroborating circumstances clearly indicate the trustworthiness of the statement" as affording a proper standard and degree of discretion. It was contemplated that the result in such cases as *Donnelly v United States*, 228 US 243 [33 S Ct 449; 57 L Ed 820] (19[13]), where the circumstances plainly indicated reliability, would be changed. [Moore, § 804.01(12.-2), p VIII-231, quoting House Conference Committee Report to Rule 804(b)(3), pp 16-17.]

Accordingly, although we need not decide the issue in the instant cases, if the only corroborating circumstance was the individual defendant's statement, standing alone, we might have a different situation. See, for example, *United States v Rodriguez*, 706 F2d 31, 40 (CA 2, 1983).[15] However, we find other corroborating circumstances presented in this case, which we will explain below.

Although Congress indicated what it believed would *not* be sufficient corroboration, it left the answer to what *would* be sufficient to case-by-case development. However, we need to be cognizant of the competing interests that were at issue in *Donnelly*. The state's interest in ensuring that evidence be credible has been recognized for centuries. As noted by the Court in *Donnelly*:

> "It was very justly observed by a great judge that 'all questions upon the rules of evidence are of vast importance to all orders and degrees of men; our lives, our liberty, and our property are all concerned in the support of these rules, which have been matured by the wisdom of ages, and are now revered from their antiquity and the good sense in which they are founded.'" [*Donnelly*, 228 US 276, quoting Chief Justice Marshall in *Queen v Hepburn*, 11 US (7 Cranch) 290, 295; 3 L Ed 348 (1813), quoting Lord Kenyon in *Rex v Eriswell*, 3 TR 721 (1790).]

However, Congress, in enacting FRE 804(b)(3), expressly rejected the result in *Donnelly* and indicated that the historic rules of evidence should not be rigidly applied to exclude reliable exculpatory evi-

___

[15] "The bare testimony of a codefendant charged with the same crimes as the one calling him as a witness is utterly devoid of corroboration." *United States v Annese*, 631 F2d 1041, 1045 (CA 1, 1980).

dence. Justice Holmes' dissent in *Donnelly* persuasively explained why:

> The confession of Joe Dick, since deceased, that he committed the murder for which the plaintiff in error was tried, coupled with circumstances pointing to its truth, would have a very strong tendency to make any one outside of a court of justice believe that Donnelly did not commit the crime. I say this, of course, on the supposition that it should be proved that the confession really was made, and that there was no ground for connecting Donnelly with Dick.— The rules of evidence in the main are based on experience, logic and common sense, less hampered by history than some parts of the substantive law. There is no decision by this court against the admissibility of such a confession; the English cases since the separation of the two countries do not bind us; the exception to the hearsay rule in the case of declarations against interest is well known; no other statement is so much against interest as a confession of murder; . . . and when we surround the accused with so many safeguards, some of which seem to me excessive, I think we ought to give him the benefit of a fact that, if proved, commonly would have such weight. [*Id.*, 228 US 277-278.]

In short, the defendant's constitutional right to present exculpatory evidence in his defense and the rationale and purpose underlying MRE 804(b)(3) of ensuring the admission of reliable evidence must reach a balance. We believe they may be viewed as having an inverse relationship: the more crucial the statement is to the defendant's theory of defense, the less corroboration a court may constitutionally require for its admission. *Rivera v Illinois Dep't of Corrections*, 915 F2d 280, 281 (CA 7, 1990) (excluding vital evidence was an abuse of discretion); *Slaughter*, 891 F2d 698 (excluding crucial evidence was an abuse of discretion). In contrast, the more remote or tangential a statement is to the defense theory, the more

likely other factors can be interjected to weigh against admission of the statement. *Thomas*, 62 F3d 1338 (where evidence was cumulative, exclusion was not an abuse of discretion); *Fowlie*, 24 F3d 1069 (exclusion of tangential evidence was not an abuse of discretion).

Nevertheless, the constitutional background of this balancing test must be of foremost consideration. Because there can be no bright-line rule in this area, resolution must be case by case. But, as Justice Holmes observed, "experience, logic and common sense" should guide us in reaching a point where the appellate court will find that the trial court abused its discretion by excluding the exculpatory evidence.

IV

We turn now to the instant cases. There is no question that Copeland's statement was in fact made, which is a considerable factor when reviewing whether a witness should be allowed to repeat the statement at trial. *Donnelly*, 228 US 277 (Holmes, J., dissenting). The entire text of Copeland's statement is reprinted in the appendix following this opinion. Copeland's custodial statement was given after he had been advised of his *Miranda*[16] rights. Additionally, in the statement, he expressly stated that he had not been promised anything to make the statement. Indeed, Copeland was later convicted of first-degree premeditated murder in large part on the basis of this statement. He was subsequently sentenced to life in prison without parole. We find no facts surrounding the making of the statement that suggest that Cope-

---

[16] *Miranda v Arizona*, 384 US 436; 86 S Ct 1602; 16 L Ed 2d 694 (1966).

land was promised a deal or that he would not face
the full punishment of the law for anything that he
would say. Given that he had been advised that any-
thing he said could have been used against him, we
find that a reasonable person in Copeland's position
would have realized that any admissions by him could
implicate him in a crime.

The trial court found that Copeland's statement was
not inculpatory. We disagree. We find that Copeland's
statement would have been probative of many possi-
ble crimes. He admitted taking an illegal controlled
substance: "We took hits of mescaline." He admitted
negotiating with a prostitute for a sex act. More
importantly, he admitted to stabbing the victim:

> We took her back to Chandler Park—Balduck. The girl
> told us that she would give us all a good price for sex.
> I . . . was doing all the talking to the girl because my
> friends Fred, Mike and Mark are id[io]ts they don't know
> how to talk to the girl. So we got there and we started tak-
> ing her clothes off because she told me that she liked it
> rough. So we all proceeded to take her clothes we was rip-
> ping the clothes off her. That's when I started to get hyper-
> active. From then on she gave Mike head. I kept thinking
> about that and the more I thought about that that's when I
> had it in me that she was Spooner. Jen[n]ifer Spooner is a
> girl that I use[d] to go out with. I walked over while she
> was giving Mike head and I looked at her and it appeared to
> be Spooner to me. I became upset because about 7 months
> ago I caught Spooner having sex with another guy. Then I
> told the girl I would kill her. I told her I'm going to kill you.
> I called her Spooner. Then that's when I did it. I pulled the
> knife down out of my sleeve. My left sleeve is where I keep
> my knife. I grabbed [the] knife out of my sleeve, pulled it
> out and I stabbed her in her body I'm not sure where. All I
> could do then was feel confused and happy.

After the defendants sought to use this statement as exculpatory evidence, the prosecutor argued before the trial court that the statement was not against Copeland's penal interests:

> *Mr. Less*: Yes. In that statement Mr. Copeland[] denies any plan with anyone. . . .
>
> *The Court*: The statement says no premeditation on anyone's part?
>
> *Mr. Less*: Correct. His statement—to use Mr. Rex's words—in essence, while this sex was going on with the girl who, quote, liked—not Mr. Rex, Mr. Copeland—liked it rough. So everybody [was] tearing her clothes off. Mr. Copeland experienced a psychotic experience from taking mescaline, and LSD and started hallucinating; that it was someone else. That's not against penal interest. What you are saying—almost exculpatory—saying, I'm under the influence of something. I'm not in the right mind.

The trial court excluded that statement in part because it found that Copeland was "really making an excuse for his conduct" rather than making "a clear statement of his own criminal responsibility." However, MRE 804(b)(3) merely requires that the statement be probative against the declarant. We find that we can present no argument more persuasive than the prosecutor's later position regarding why Copeland's statement was probative of criminal responsibility. At Copeland's trial, the prosecutor argued during his closing argument:

> [*Mr. Less*:] Now, Mr. Copeland makes a statement to Sergeant Sanders, and that statement, you heard it yesterday afternoon, and you can take that into the jury room with you. There are certain things that I went through when I read that statement that just struck me as being—jumping out at me, jumping out. And I'm going to tell you . . . .

Mr. Copeland, in his statement, kind of sets the mood. Yeah, he's out with his friends, he says, and they're going to drive around, have some laughs. He tells you: "We decided to get together and have a few laughs." Him and Mr. Barrera and Mr. Musall and Mr. Johnson. They're going to have a few laughs.

Then he tells you, going to take some mescaline and drink some beer. And then he tells in the statement all about mescaline because, in his words, "I took a drug class. That's how I know." He's an expert, man. He's a self-made expert on drugs.

So what does he do? He's going to tell you how these drugs inflamed his mind and clouded his mind and he couldn't form an intent to do any crime. Well, let's see what he tells us. He takes the mescaline. "We were out cruising around, looking for people to laugh at." Mr. Copeland is going to drive around, and that's a fun way to have a date. We're just going to go up and down Van Dyke, out of our neighborhood, look for people to laugh at.

Page 4 is where his contradictions start. After he claims they pick up the deceased, the victim in this: "We left that neighborhood because there is racial problems over there, you know." And his next sentence after he says that is: "By that time, I had the full effect of the mescaline going."

Well, let's think about something. If you leave a neighborhood because you perceive there to be some kind of problem, what does that show you? If you can think of that—I mean, if you can make that determination, doesn't it show that you're conscious? Doesn't it show that you're purposeful? Doesn't that show that you know where you're at and what's going on and you can make a decision?

\*     \*     \*

Then we come on page 5, while the victim is "giving Mike head, I kept thinking about that, and the more I thought about that, that's when I had it in me that she was Spooner." Well, he's thinking about it. I mean, he's out here . . . and he's weighing it in his mind.

\*     \*     \*

Then, on page 6, he says, "I told her, 'I'm going to kill you.'" Well, what could be clearer of a person's intent? If someone says, "I'm going to"—if someone comes up to me and says, "I'm going to kill you," I'm going to take that kind of seriously because, if someone's saying that, . . . it shows what they're doing. And then, if they do something, if they pull a gun out or get something pointed at me after they said those words, I would have no doubt of what their intent is. . . .

\*        \*        \*

On page 9, Sergeant Sanders asked him some questions and he says: "I forced myself to stab her." No one is—the drugs aren't forcing him. It's not that he doesn't know what he's doing. It's not that he's not aware of what's going on. . . . [T]here's something else on page 9. . . . [H]e says, "I got some head from her, but I stopped because I was afraid of getting a disease." Here's a guy that's supposed to have the full effect of the mescaline going. He doesn't know what he's doing. The drugs have obliterated his good judgment and he can't form any intent, and yet he can think about communicating diseases. . . . [T]hat shows a consciousness, that shows a sense of surrounding, that shows a mind free and clear of any wild and—you know, hallucinations.

The prosecutor obviously found Copeland's statement to be reliable probative evidence of Copeland's guilt. He cannot now argue that it was not. *Green v Georgia*, 442 US 95, 97; 99 S Ct 2150; 60 L Ed 2d 738 (1979) (the statement was sufficiently reliable for the state's case); *Rivera*, 915 F2d 282 ("The confession was reliable enough to be used to put [the declarant] away for the rest of his life, and no reason is suggested why, if only it had been made to a close friend—but not otherwise—it would be reliable evidence of [the defendant's] innocence as well"); *United States v Brainard*, 690 F2d 1117, 1125 (CA 4,

1982) ("The government's attempt to have it both ways strikes us as imprudent and unfair"); *Thomas*, 571 F2d 289 ("The statement may be offered by the government to inculpate the declarant or by the accused to exculpate himself").

The trial court also found that Copeland's statement was not exculpatory with respect to Barrera, Musall, and Johnson. We disagree. In the statement, Copeland was asked: "Did Mark, Mike or Fred stab the woman[?]" He replied: "They had knives on them but not to my knowledge." This statement was exculpatory with respect to Barrera's and Musall's defense: they admitted being there, but denied stabbing her. In addition, Musall himself admitted that he possessed a knife that night. The prosecutor argued to Musall's jury that Musall also stabbed the victim. Therefore, Copeland's statement that Musall did not stab the victim did exculpate Musall on a critical issue in the case. More importantly, the statement provided a motive for the killing (Copeland thought the victim was Spooner) and established that the idea of stabbing the victim was spontaneous. This was exculpatory evidence with respect to the defendants' theory that they did not anticipate Copeland's actions. Therefore, the trial court erroneously held that the statement was not against Copeland's penal interests and that it was not exculpatory with respect to Barrera and Musall.

The trial court also found that there was insufficient corroborating evidence of statements made within the context of the confession. The Court of Appeals likewise held that there were insufficient corroborating circumstances to support admission of

Copeland's statement.[17] The panel did not address the defendant's constitutional arguments.

In order to address whether there were sufficient corroborating circumstances of the trustworthiness of the statement to satisfy constitutional requirements, we first must separately consider the evidence and the theories of both the prosecution and the defense with respect to each defendant to ascertain the level of each defendant's need for presenting the evidence.

### PEOPLE v BARRERA

In Barrera's statement to the police, he indicated that he was the driver that night. He also stated that he had kicked the victim in the head:

> I kicked her in the head before Matt stabbed her because she was on her knees when I kicked her and she was yelling and screaming[.] [T]hat's why I kicked her in her head.[18]

---

[17] The panel reasoned:

In the case at bar, we are not persuaded that there is sufficient corroboration of the trustworthiness of the statement to merit its admission. Indeed, many aspects of Copeland's statement were at odds with evidence offered by defendants. In particular, Copeland stated that both he and Barrera had used mescaline, with Copeland attributing his actions to the effects of mescaline, while Barrera never mentioned the use of mescaline in his own statement. Moreover, Copeland contended that the victim voluntarily engaged in the sexual acts which occurred before the killing, which is contrary to the statements of both defendants in this case. Similarly, Copeland claimed that everyone involved in the offense participated in taking off the victim's clothes, while both defendants here denied doing so in their respective statements. Finally, Copeland stated that he stabbed the victim while she was performing fellatio on Musall, while Musall claimed that he had finished and was walking away when Copeland came over and stabbed the victim. [N 3 supra, slip op at 1-2.]

[18] The medical examiner testified that she found two separate bruises on the victim's scalp. One was consistent with a fall and the other was not

He denied that there was any plan to rob or rape the woman. He admitted that a cassette tape that was found at the scene was his. He also admitted that he ripped up the victim's jacket.

Barrera was tried for first-degree premeditated murder and first-degree felony murder. With respect to the first count, the prosecution's theory was that Barrera aided and abetted in the killing, in particular by driving the car and by kicking the victim down before her throat was cut. The prosecutor repeatedly argued that this was a "[f]our against one," planned gang attack. Further, he argued that Barrera was in control of the car and drove to a remote, secluded spot to accomplish the rape, robbery, and murder.

With respect to felony murder, the prosecutor argued that Barrera helped create the situation with knowledge that death or great bodily harm would occur. He argued that this was the requisite malice.[19] The prosecutor also argued that even if the crime was spontaneous, Barrera was guilty of second-degree murder because he helped destroy her clothes and left her to die behind a secluded building.

In contrast, Barrera's defense was that there was no premeditation because there was no plan to rob, rape, or kill the victim. He only thought that they had hired a prostitute, and that they would have sex and then leave. He thought that they were there "to party." He did not know that Copeland had a knife with him.

---

caused by a heavy instrument. She further testified that the wounds would have been inflicted shortly before death. She also concluded that these wounds were not the contributing cause of death. We contrast this case with *United States v Silverstein*, 732 F2d 1338, 1347 (CA 7, 1984), in which the medical evidence directly contradicted the declarant's story.

[19] *People v Aaron*, 409 Mich 672; 299 NW2d 304 (1980).

He further argued that kicking the victim, an assault and battery, did not amount to an intent to create a high risk of death by multiple stab wounds.

In his statement, Barrera described his version of the stabbing:

> We all got out of the car and we went behind the bath-rooms. I can't remember exactly who made the first move but Matt and Fred grabbed the hooker and ripped her shirts and pants off. They grabbed her and pulled her shirt off and she fell on the ground and that's when they, Matt and Fred tore her pants off. Matt made her suck his dick and after she was done he slapped her and then Mike stepped up and made her suck his dick.
>
> Q. What were you and Fred doing at this time?
>
> A. We were drinking Labatts Beer watching and talking to each other. Fred was saying how sick it was what Matt and Mike was doing. Then while she was sucking Mike's dick, Mike stepped back and Matt started [to] beat the girl with his fist. He kicked her and then he pulled out this big Rambo knife. I think he had it in the back of his pants. He pulled the knife out and stabbed her. Fred said "Oh my God." I couldn't believe this was happening. I turned around and went to the car.

Barrera was convicted of first-degree felony murder. Under *People v Aaron*, 409 Mich 672; 299 NW2d 304 (1980), the jury was required to find that Barrera himself had malice.[20] In this case, Barrera's intent was the critical issue. Barrera's jury was told through Barrera's statement that Copeland did the stabbing. However, by excluding Copeland's statement, the trial court did not permit the jury to hear *why* Copeland

[20] In other words, Barrera must have "acted with intent to kill or to inflict great bodily harm or with a wanton and willful disregard of the likelihood that the natural tendency of his behavior is to cause death or great bodily harm." *Id.* at 733.

killed the victim.[21] We find that this explanation of the stabbing was evidence crucial to Barrera's defense that he had no reason to expect that someone would kill the victim and that Copeland acted spontaneously and without warning. There was no evidence suggesting that Barrera could have anticipated that the prostitute resembled Copeland's former girlfriend, or that Copeland would hallucinate and believe that she was his old girlfriend, or that Copeland would pull out a knife and stab her to death.

Because the explanation for the stabbing was evidence crucial to Barrera's theory of defense, his constitutional right to present this evidence limited the threshold of corroborating circumstances that the court could require of Copeland's statement. We find that the trial court improperly focused on minor inconsistencies in the statement. Those inconsistencies go to the weight of the evidence—not to its admissibility. *Garcia*, 986 F2d 1140-1141. The *primary* statement in the confession was corroborated by the statements of all three codefendants: Copeland spontaneously acted alone in the stabbing.

Additionally, we find the following factors further corroborated the trustworthiness of Copeland's statement. Applying the three-factor inquiry set out above, we find that there was not a close relationship between Copeland and Barrera that would induce Copeland to "take the rap" for Barrera.[22] Further, Copeland made a voluntary statement after being

---

[21] See *United States v Friel*, 588 F Supp 1173, 1185 (ED Pa, 1984) (the statement provided a rationale for the crime).

[22] Cf. *Tovar*, n 13 *supra* at 1213. The declarant "knew that he was going to prison and wished to help out a friend *for whom he felt responsible.*" (Emphasis added.)

advised of his *Miranda* rights. Moreover, there was
no evidence that Copeland did so in order to curry
favor with the authorities: he said that he was not
promised anything for giving the statement,[23] and,
more importantly, he was later sentenced to life with-
out parole on the basis of his statement.[24]

Under the *Poole* factors, we note that although the
statement was made to law enforcement officers,
instead of shifting blame to the other three partici-
pants, Copeland directed blame *to himself* by explain-
ing his personal motive for the killing, and by
expressly stating that to his knowledge no one else
stabbed the victim. However, "[h]is incentive, one
might think, was to inculpate as many other persons
as possible and minimize his own involvement."
*Rivera*, 915 F2d 283.

We conclude that the trial court abused its discre-
tion in excluding Copeland's statement and violated
the Due Process Clause of the Fourteenth Amend-
ment.[25] This preserved constitutional error is not
harmless because we cannot declare beyond a rea-
sonable doubt that the exclusion of this evidence did

---

[23] Cf. *United States v DeVillio*, 983 F2d 1185, 1190 (CA 2, 1993) (the
statement was made while cooperating with the police and the declarant
would not be prosecuted).

[24] We also note that Copeland denied being high on anything at the time
of the statement. Cf. *United States v Guillette*, 547 F2d 743, 754 (CA 2,
1976) (a statement made while drinking).

[25] We note this comment by our colleague:

   Moreover, if one carried the lead opinion's argument to its logical
   conclusion, a trial judge could preclude a *statement offered by a
   defendant which inculpates a codefendant declarant and excul-
   pates the defendant who seeks its admission. This, evidentiary
   barrier . . . clearly violates the Due Process Clause of the Four-
   teenth Amendment.* [*Watkins*, 438 Mich 703 (RILEY, J., dissenting)
   (emphasis added).]

not contribute to the jury verdict by undermining Barrera's defense. *Chapman v California*, 386 US 18, 24; 87 S Ct 824; 17 L Ed 2d 705 (1967). We therefore reverse the decision of the Court of Appeals, vacate Barrera's conviction, and remand the case for a new trial consistent with this opinion.

### PEOPLE v MUSALL

Musall recounted in his statement that he had hit the victim in her face while they were traveling in the car. He also stated that he started to engage in fellatio with the victim, but then stopped because he was scared. He further admitted that he had been carrying a six-inch knife that night, and that he threw it away at the top of a hill after he and Fred started running when Copeland began stabbing the victim.

There was also evidence that Musall cut his right hand during the evening. In his statement, Musall asserted that he cut it later in the car while looking for a lighter on the floor. In contrast, Copeland's girlfriend, Carol Keane, testified that Musall cut his hand by hitting a beer bottle on a mirror on Barrera's car. On cross-examination, she testified that Musall's hand was not cut when she first saw him on the morning of October 28, 1988. However, the prosecutor argued that Musall cut his hand while he was stabbing the victim.

Musall was tried on alternate counts of first-degree premeditated murder and first-degree felony murder. As in Barrera's case, the prosecutor repeatedly argued that this was a "four against one" gang attack. The prosecutor presented essentially three theories. First, as in the *Barrera* case, the prosecutor argued that Musall was guilty of premeditated murder under an

aiding and abetting theory because this was a thought-out plan to rape, rob, and then kill the victim. Second, the prosecutor argued that Musall actually stabbed the victim,[26] drawing on inferences that he cut his hand sometime during the night.[27] And finally, the prosecutor argued that Musall was guilty of felony murder because his conduct demonstrated a wilful and wanton act, knowing that death or great bodily harm might occur because he participated in the four-against-one scheme, hit her in the car, and got to the park and stayed there, while forcing her to engage in oral sex with him. The prosecutor contended that this conduct satisfied the malice requirement.

Musall's defense was that he had not intended that the victim die, that he did not participate in killing her, and that there was no preconceived plan to kill her. He admitted hitting her in the car, but contended that that occurred well before they reached the park. He argued that Copeland was the instigator of the group's activities and that Copeland, alone and spontaneously, stabbed the victim.

We note that Musall's jury did hear testimony from a police officer that all of the defendants had stated that Copeland had done the actual stabbing. However,

---

[26] Musall stated that his knife was six inches long. Likewise, Copeland described his knife as six inches long. The medical examiner testified that the stab wounds were up to four inches deep. Therefore, the evidence was consistent with a six-inch knife being used. Additionally, the medical examiner testified that she could not tell whether more than one knife had been used.

[27] In closing, the prosecutor argued:

Inference can be made that Copeland is not only cutting, stabbing, but Mr. Musall is participating. Mr. Musall cut his hand in the frenzy of stabbing this young lady. That's why he gets rid of the knife.

as in Barrera's case, the jury did not hear *why* Copeland stabbed her. This explanation of Copeland's motive for killing her was crucial to Musall's defense that he did not anticipate Copeland's actions. For the same reasons explained above with respect to Barrera, here too we consider the three-factor inquiry along with the *Poole* factors and reach the same conclusion: we believe that the trial court abused its discretion in excluding Copeland's statement. This violated Musall's constitutional right to present his defense, and the error was not harmless beyond a reasonable doubt.

We find that the reasons for finding prejudicial error are even more compelling in Musall's case because the prosecutor's theory before the Musall jury was directly contradictory to his theory before Copeland's jury. In his closing statement before the Copeland jury, the prosecutor stated:

> I'm not quite sure how Mike avoided getting parts of his body cut off because, if this woman is performing oral sex on him, and [Copeland is] looking at them and, all of a sudden, [Copeland] pulls out a knife and starts chopping, Mike is, I guess, miraculously, not chopped up out there, too.

If the prosecutor is not sure whether Musall stabbed the victim or whether he "miraculously" avoided being stabbed, then this Court cannot be convinced beyond a reasonable doubt that Musall's jury was sure either. Had the jury heard Copeland's explanation of why he killed the victim, it may have accepted Musall's defense, as the prosecutor apparently did in the subsequent trial.

Therefore, we reverse the decision of the Court of Appeals, vacate the conviction, and remand for a new trial.

V

RESPONSE TO DISSENTING OPINION

The dissent argues that Barrera and Musall were not constitutionally entitled to use Copeland's statement as exculpatory evidence with respect to proving their state of mind at the time of the stabbing because the dissent believes that Copeland's state of mind was not relevant to his co-participants' defenses to aiding and abetting felony murder. *Post* at 316-317. However, the respective juries did not articulate whether they convicted the defendants of felony murder as principals or as aiders and abettors. Nevertheless, in Michigan, an aider and abettor must possess the same requisite intent as that required of a principal. *People v Kelly*, 423 Mich 261, 278; 378 NW2d 365 (1985). *Kelly* explained the aiding and abetting felony-murder theory:

> The requisite intent is that necessary to be convicted of the crime as a principal. *Meister v People*, 31 Mich 99 (1875). In this instance, under *Aaron*, it therefore must be shown that the aider and abettor had the intent to kill, the intent to cause great bodily harm or wantonly and willfully disregarded the likelihood of the natural tendency of his behavior to cause death or great bodily harm. *Aaron*, 409 Mich 733. Further, if the aider and abettor participates in a crime with knowledge of his principal's intent to kill or to cause great bodily harm, he is acting with "wanton and willful disregard" sufficient to support a finding of malice under *Aaron*. [423 Mich 278-279.]

Hence, it would not be sufficient for the jury to con-
clude only that Barrera or Musall had assisted
another in committing or attempting to commit a lar-
ceny or rape.[28] *Aaron* requires the jury to take the
additional step of finding, beyond a reasonable doubt,
that the defendant himself possessed the requisite
intent with respect to the *murder*.[29] That requisite
intent is *malice*, whether proven or inferred from the
circumstances.

The dissent states:

> Copeland's statement regarding his hallucination speaks
> only of his own state of mind. The relevant inquiry is
> whether Barrera and Musall possessed the requisite state of
> mind.
>
> Stated otherwise, that Copeland confessed to stabbing
> the woman does not negate *the possibility* that Barrera and
> Musall also possessed a state of mind sufficient to be found
> guilty of felony murder. [*Post* at 319 (emphasis added).]

---

[28] Accordingly, the dissent's reliance on *Sharlow v Israel*, 767 F2d 373
(CA 7, 1985), is misplaced. That diversity case applied Wisconsin law,
which does not require any mental state for felony murder. *State v Oimen*,
184 Wis 2d 423, 445; 516 NW2d 399 (1994).

[29] With respect to felony murder, the juries were properly instructed
that they had to find proof beyond a reasonable doubt that the individual
defendant possessed the state of mind of malice at the time of the killing.
With respect to aiding and abetting, the juries were properly instructed
that they had to find beyond a reasonable doubt that

> the defendant must have intended the commission of the crime
> charged or have known that the other person intended its commis-
> sion at the time of giving aid and encouragement.
>
> It does not matter how much aid, advice or encouragement was
> given but, however, you must find that the defendant intended the
> commission of the crime, and that the aid, advice or encourage-
> ment that the defendant gave did, in fact, aid, advise or encourage
> the commission of the crime.
>
> Mere presence, even with knowledge that an offense is plan[ned]
> or being committed is insufficient to establish that a defendant
> aided or assisted in the commission of the crime.

We do not disagree with the dissent that there is "a possibility" that a jury, even after hearing Copeland's statement, may find that the defendants also acted with malice. However, "a possibility" of malice is insufficient—malice must be proven beyond a reasonable doubt.

It is in this respect that the dissent is missing the forest for the trees. Four defendants were involved in some way with the events that occurred that night. All four defendants stated that one, and one alone, stabbed the victim. All four stated that the stabbing was spontaneous, and three stated that it was unanticipated by them. The decisive question before the respective juries was whether Barrera or Musall *intended* to create a very high risk of serious harm to the victim and *knew* that such harm was a *probable* result of his actions. The dissent contends that Copeland's statement "does not support a defense that the defendants did not aid or abet a felony murder." *Post* at 320. We disagree. Copeland's motive and thought process in killing the victim, "she resembled Spooner," would have a direct effect on the required felony-murder element of malice, whether under a cofelon theory as addressed in *Aaron*, or under an aiding and abetting theory as addressed in *Kelly*, because the spontaneity of the killing was probative of the defense theory that the stabbing was unanticipated and beyond the scope of the alleged common enterprise of rape or larceny. *People v Pitts*, 84 Mich App 656, 662; 270 NW2d 482 (1978).

Michigan case law requires the jury to find a causal link between the felony and the *death*. *People v Datema*, 448 Mich 585, 601-602; 533 NW2d 272 (1995). The dissent points to evidence that Barrera kicked

the victim and that Musall hit the victim in her face. *Post* at 322. However, the dissent must concede that a mere intent "to injure" falls short of *malice, Datema, supra* at 606, and that mere participation in committing the underlying felony, without a finding of malice with respect to the death, likewise falls short of felony murder, *id.* at 601. Accordingly, evidence that would tend to prove that Barrera's and Musall's respective intents fell short of malice would indeed support the defendants' theories that they did not have any reason to anticipate that *death* or *great bodily injury* would occur.

Finally, we do not hold that a trial court should allow a defendant to present unreliable evidence as suggested by the dissent. *Post* at 304. Instead, we hold that a trial court cannot place too many hurdles in front of admitting evidence that is not only crucial to the defense theory and uncontradicted by any other evidence in the case, but also has some common-sense basis of trustworthiness.

As to redacting the portions of the statement that do not directly inculpate Copeland, we note that the prosecutor has not argued that such redaction is required. We leave this issue for the trial court for further analysis. We do note that in *Williamson*, the Supreme Court did not address application of the carry-over rule in the context presented by the instant cases. We also note that *Carson v Peters*, 42 F3d 384 (CA 7, 1994), a case on which the dissent relies, expressly recognized that *Williamson* dealt with situations in which the *prosecution* seeks to use a codefendant's statement and further stated that "defendants have an easier time under the second sentence of Rule 804(b)(3) . . . ." *Id.* at 386. We find

that the critical portions of Copeland's statement, where he described why and how he stabbed the victim, and that the other three did not stab the victim (which would be inculpatory because it intensified his culpability and depravity through the number of stab wounds), were against his penal interests and should be admitted on retrial.

BRICKLEY, C.J., and LEVIN, RILEY, and MALLETT, JJ., concurred with CAVANAGH, J.

### APPENDIX

#### MATTHEW COPELAND'S STATEMENT

*Q.* Mr. Copeland, were you advised of your constitutional rights?

*A.* Yes.

*Q.* Do you have any questions regarding your rights?

*A.* No I don't.

*Q.* Have you been threatened or promised anything to make a statement?

*A.* No I haven't.

*Q.* Do you now wish to make a statement of your own free will and accord?

*A.* Yeah.

*Q.* Tell me what your involvement was regarding the murder of a black female in Balduck Park last Thursday night Oct[ober] 27th and Friday morning Oct[ober] 28th—early morning hours.

*A.* Me, my three friends Mark, Fred and Mike we decided to get together and go out last Thursday night and to have a few laughs and get high off Mescaline drugs. That's what we did. We took hits of Mescaline. Me and Mark did. I did three hits, Mark did three also.

*Q.* Explain what a hit of Mescaline is and how you take it.

*A.* A hit of Mescaline is a hallucinogen—like you swallow or eat them. It can sometimes make you see stuff or eat

stuff that ain't there. I took a drug class that's how I can explain it to you. It[']s got traces of strychnine poison. It's a homemade drug. It's like you do it and hope that you don't die or freak out or have a bad trip.

*Q.* Ok. So you and Mark took some Mescaline. Then what happen[ed] as it relates to the murder of the black female?

*A.* We was——were just cruising along with Mark driving his car. We got to 7 Mile and Van Dyke and we were riding around looking for some people to laugh at—fat people, punk rockers or weird persons, when we saw this black female prostitute. She flagged us down and so we picked her up. We left that neighborhood because there is racial problems over there you know. By that time I had the full [e]ffect of the Mescaline going.

*Q.* By the way, have you had any Mescaline today?

*A.* No, I did it Saturday and Sunday. Somebody put Mescaline in my beer.

*Q.* Are you high off anything now.

*A.* No, I'm not.

*Q.* So you['re] alert, responsive and awake to all of my questions, is that correct?

*A.* Yes.

*Q.* Continue at the point that you've picked up the black female and leaving the Van Dyke area.

*A.* We took her back to Chandler Park—Balduck. The girl told us that she would give us all a good price for sex. I was doing all the talking to the girl because my friends Fred, Mike and Mark are id[io]ts—they don't know how to talk to the girl. So we got there and we started taking her clothes off because she told me that she liked it rough. So we all proceeded to take her clothes—we was ripping the clothes off her. That's when I started to get hyperactive. From then on she gave Mike head. I kept thinking about that and the more I thought about that—that's when I had it in me that she was Spooner. Jen[n]ifer Spooner is a girl that I use[d] to go out with. I walked over while she was giving Mike head and I looked at her and it appeared to be Spooner to me. I became upset because about 7 months ago I caught Spooner having sex with another guy. Then I told

the girl I would kill her. I told her I'm going to kill you. I called her Spooner. Then that's when I did it. I pulled the knife down out of my sleeve—my left sleeve is where I keep my knife—I grabbed [the] knife out of my sleeve—pulled it out and I stabbed her in her body—I'm not sure where. All I could do then was feel confused and happy.

*Q.* Are you left or right handed?

*A.* Left handed.

*Q.* So how many times did you stab the woman that night?

*A.* I don't know, I remember the first blow it may have been more stabs.

*Q.* Did Mark, Mike or Fred stab the woman?

*A.* They had knives on them, but not to my knowledge.

*Q.* Did you see blood coming from the woman?

*A.* Yes, on my hands.

*Q.* Did you get blood on your clothes?

*A.* No.

*Q.* Where are the clothes that you wore that night of the murder?

*A.* Lying around in my room some where.

*Q.* Have the clothes been washed?

*A.* No.

*Q.* Tell me what you had on that night.

*A.* I had on blue jeans and my leather jacket or my army coat, I don't remember my shirt.

*Q.* So after you stabbed the woman, what did you do?

*A.* I turned and faced the sky and from then on I was feeling like I overdosed on the Mescaline.

*Q.* You knew exactly what you were doing when you pulled the knife out and stabbed the woman, is that correct?

*A.* I was in a different state of mind. I looked at a tree and could taste the color of the tree.

*Q.* No one forced you to stab the woman, did they?

*A.* I forced myself to stab her.

*Q.* How did the woman's clothes get thrown about the ground?

*A.* My friends threw them around. I was just trying to pull her pants off.

*Q.* Did you have sex with this woman?

*A.* No, I didn't. I got some head from her, but I stopped because I was afraid of getting a disease.

*Q.* At what point did you have oral sex with the female?

*A.* Shortly after we got there.

*Q.* Did you force the woman to commit oral sex on you?

*A.* No, I didn't, she offered it.

*Q.* After you tore her clothes off, she willingly had sex orally with you. Is that correct?

*A.* Yes, she said she liked it rough.

*Q.* Did you plan to rape and kill this woman prior to you arriving at Balduck Park?

*A.* No, I did not.

*Q.* Did you discuss with Mark, Fred and Mike that you were going to rape and kill the woman before arriving at the park?

*A.* No, I didn't.

*Q.* Just exactly where did you stab the woman, where were you in the park, I should say?

*A.* It was by the building with all the spray paint on it. The building is all boarded up.

\* \* \*

*Q.* What exactly did Mark, Mike and Fred do as it relates to their activity in the park that you could see and remember?

*A.* Mike, he got some head from the woman, I don't recall what Fred and Mark were doing exactly.

*Q.* Who kicked the woman?

*A.* I don't remember.

*Q.* Did you kick the woman?

*A.* Yes I might have, I don't remember exactly.

*Q.* What type of beer were you drinking?

*A.* I was drinking Budweiser.

*Q.* Did you take anything from the woman?

*A.* Not that I can remember, no I didn't.

*Q.* Where is the knife that [you] used to kill the woman?

*A.* I lost it that night. It could be anywhere from the Balduck Park to 10 Mile and Hoover, cause I went to pick up my girlfriend Carol Kean[e]. She lives on 10 Mile at Hoover. I told her I needed someone to stay with me that night.

*Q.* Did you tell Carol what you had done regarding stabbing the woman in the park?

*A.* I told her that I had stabbed someone that night.

*Q.* Did you tell anyone else that you stabbed a woman in Balduck Park?

*A.* Yes I did. I told Steve, he lives in Sterling Heights, you can contact Steve through Eddie—whether he lives on Glenwood. The old phone is 526-7567. It's been changed though. I told Eddie to. They told everyone else cause they're the only two I told about the murder, but I didn't know I killed her though.

*Q.* Was the woman moving when you left her lying in the park?

*A.* I don't remember.

*Q.* What did this woman have on as far as clothes, describe her clothes if you remember?

*A.* She had on a blue or dark jacket and some jeans.

*Q.* So why did you stab this woman again. Explain briefly.

*A.* I thought she was Spooner. She appeared to be Spooner. That's what made me go off like I did.

*Q.* Where exactly may you have put the knife after this incident?

*A.* I don't recall.

*Q.* Why didn't you put the knife back up your sleeve?

*A.* I don't know.

*Q.* Is there anything else you can remember regarding this incident at this time?

*A.* That's it, you've got everything.

*Q.* I now want you to read your entire statement, check it for any errors, make any additions or corrections that you wish, then sign the bottom of each page indicating you've read your entire statement. Do you understand Mr. Copeland?

*A.* Yes I do.

*Q.* Isn't it true that when you arrived out there in Balduck Park, you along with your friends, forced the woman to disrobe against her will, and attempted to rob her?

*A.* No.

*Q.* Did you have the opportunity to read your entire statement and make any necessary corrections?

*A.* Yes I did.

*Q.* Is this statement true to the best of your knowledge?

*A.* Yes, the statement is true to the best of my knowledge.

/s/ Matthew Copeland

/s/ Sgt. Ronald Sanders

BOYLE, J. I respectfully dissent. The Court concludes that the Constitution of the United States[1] and MRE 804(b)(3) compel the admission of Matthew Copeland's self-serving statement. I disagree.

The jury in each case learned of Copeland's causative act through other evidence. What was contained in the statement that the juries did not know was denial and disavowal: Copeland did not rob, Copeland did not rape, Copeland did not premeditate, and Copeland did not know what he was doing because he was under the influence of drugs. Thus, the Court's conclusion that the statement is self-incriminating to the degree that a reasonable person would not have said it unless it were true is clearly not warranted. The statement was not truly inculpatory.

Second, the statements regarding the defendants were neutral or self-serving and were not exculpatory

---

[1] US Const, Am XIV.

of them. Finally, there are insufficient, corroborating circumstances that clearly indicate the trustworthiness of Copeland's statement. Nothing in the constitution or MRE 804(b)(3)  compels the admission of Copeland's statement. The trial court properly suppressed it.

The test for admissibility under MRE 804(b)(3)  is not whether the statement would be probative in the declarant's trial. Nor is admissibility determined by how "crucial the statement is to the defendant's theory of defense . . . ." *Ante* at 279. While the importance of the evidence in relation to the theory of defense is critical to a claimed due process violation, the foundation of the exception is circumstances indicating trustworthiness. The preliminary question of admissibility clearly cannot turn on rote application of the hearsay rule.[2] Just as clearly, necessity does not determine admissibility. The Court's formulation construes the Due Process Clause as if it guaranteed the use of unreliable evidence, provided it is crucial. Correctly understood, due process requires the state to put reliable third-party statements before the jury, despite the hearsay rule.

I

THE DEFINITION OF STATEMENT

The Court does not address a preliminary question regarding the definition of the term "statement" for statements against penal interest. MRE 804(b)(3).

---

[2] *Rivera v Illinois Dep't of Corrections*, 915 F2d 280, 281-282 (CA 7, 1990) (the declarant confessed that *he alone* had beaten decedent; there was no suggestion of any motive to exculpate or that the declarant might simply have failed to notice; due process was violated by the trial court's exclusion of the confession for no better reason than that it was hearsay).

MRE 804(b)(3) tracks the language of FRE 804(b)(3) and in pertinent part provides as follows:

> A statement which was at the time of its making so far . . . tended to subject the declarant to civil or criminal liability . . . that a reasonable person in the declarant's position would not have made the statement unless believing it to be true. A statement tending to expose the declarant to criminal liability and offered to exculpate the accused is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement.

In *People v Watkins*, 438 Mich 627, 636, 646; 475 NW2d 727 (1991), Justice CAVANAGH concluded that the term "statement" should not be read broadly to encompass the declarant's entire confession. In the context of hearsay "statements" inculpating an accused, Justice CAVANAGH reasoned:

> [O]ur confidence in the trustworthiness of a purported statement against interest extends only insofar as the specific factual assertions contained within the statement are, in fact, against the declarant's interest. . . . Each factual assertion . . . must be viewed as narrowly and specifically as reasonably possible, and the court must separately ask whether *each specific assertion* is so intrinsically against the declarant's interest that a reasonable person would not have said it unless it were true. [Emphasis in the original.]

Statements not against interest "taken by themselves" are *not* to be trusted.

After our decision in *Watkins*, the United States Supreme Court explored the definition of the term "statement" in 804(b)(3). As in *Watkins*, the issue was the scope of the hearsay exception for statements against penal interest, and the context was use

of statements inculpatory of a defendant. In *Williamson v United States*, 512 US 594; 114 S Ct 2431; 129 L Ed 2d 476 (1994), the Court held that the term refers not to the declarant's entire narrative, but covers only the parts of it that are individually self-inculpatory. Depending on the circumstances, statements that are ostensibly disserving may be either neutral or self-serving. While *Williamson* was remanded to determine whether the declarant's statement that he transported drugs was truly against his own interest, five justices felt it was not, because they concluded the declarant's primary purpose was to keep himself out of prison by confessing and handing over the defendant.

After *Williamson*, the methodology of analyzing each portion of a statement to determine whether it is against penal interest has been applied to statements offered to exculpate the defendant by the United States Court of Appeals for the Seventh Circuit, e.g., *United States v Butler*, 71 F3d 243 (CA 7, 1995), and by the United States Court of Appeals for the Eleventh Circuit, *United States v Thomas*, 62 F3d 1332 (CA 11, 1995). Justice Kennedy's concurrence in *Williamson* observes that "the Court's decision applies to statements against penal interest that exculpate the accused as well as to those that inculpate the accused." Thus, Justice Kennedy opined that, "if the declarant said, 'I robbed the store alone,' only the portion of the statement in which the declarant said 'I robbed the store' could be introduced by a criminal defendant on trial for the robbery." 114 S Ct 2443.

The Court explains its failure to address the question by correctly observing that the prosecutor did not raise the argument. However, because the initial

question before us is what this Court meant in the rule we promulgated, the failure to explain that the word "statement" is to be analyzed differently for exculpatory purposes than it is for inculpatory purposes, and differently than the identical language construed by the United States Supreme Court, is problematic. In my view, use of the *Watkins-Williamson* methodology clearly demonstrates that specific portions of the statement are not admissible because they are either neutral or self-serving. However, whether viewed individually or as a whole, I submit that Copeland's statement was not admissible under the hearsay exception of MRE 804(b)(3).

A

COPELAND'S STATEMENT WAS NOT TRULY SELF-INCULPATORY

Copeland's "statement" regarding his state of mind was not inculpatory. Speaking for the Court in *Williamson*, 114 S Ct 2435, Justice O'Connor observed, "One of the most effective ways to lie is to mix falsehood with truth, especially truth that seems particularly persuasive because of its self-inculpatory nature." First, Copeland's denial of rape, robbery, and any preplanned felony is wholly self-serving. Second, although Copeland's excuse for stabbing the victim, voluntary drug-induced intoxication, would not negate the element of malice for second-degree murder as a matter of law, *People v Langworthy*, 416 Mich 630; 331 NW2d 171 (1982), it is also a classically self-serving attempt to avoid responsibility—i.e., I did it, but I wasn't in my right mind. Despite being linked to a self-inculpatory admission of stabbing, these statements, considered either individually or as a whole, are not inculpatory. Thus, the trial court and

the Court of Appeals correctly concluded that Copeland's statement was inadmissible in the defendants' trial because it did not furnish a basis for concluding that it would not have been made unless it were true.

Copeland was asked four times whether he forced the victim to have sex. He denied forcible sex and said the victim willingly had oral sex with him after her clothes were torn off because "she liked it rough." Copeland was asked once whether he, along "with [his] friends . . . attempted to rob [the victim]." He answered, "[n]o." Copeland thus denied involvement in forcible sex or in a robbery.

Before he began to speak about the events in the park, Copeland established that he had taken three hits of mescaline and was feeling "the full [e]ffect" when they picked up the victim. Before he described the stabbing, Copeland said "I had it in me that [the victim] was Spooner." When squarely confronted twice with questions regarding his state of mind when he stabbed the victim, Copeland claimed he could "taste the color of a tree" and that it was that he thought she was his cheating ex-girlfriend, Spooner, that "made me go off like I did." In total, on four separate occasions in the course of a three-page interview, Copeland denied any intent to kill the victim.

As the United States Supreme Court has cautioned, "[t]he question under rule 804(b)(3) is always whether the statement was sufficiently against the declarant's penal interest 'that a reasonable person in the declarant's position would not have made the statement unless believing it to be true,' and this question can only be answered in light of all the surrounding circumstances." *Williamson*, 114 S Ct 2437. Thus, the most significant flaw in the Court's analysis

is the failure to evaluate Copeland's disavowals of responsibility and his acceptance of responsibility for the stabbing in light of the facts. Copeland denied the acts he could anticipate the codefendants also would deny: rape and robbery. However, Copeland previously had told three other noninvolved persons that he had stabbed the victim and believed that "everyone else" knew about it. He admitted the only act he anticipated could be contradicted, the stabbing, but did not accept responsibility for it.

Copeland's statement was therefore against his interest in only one particular, (a fact known to the defendants' juries)—namely, that he stabbed the victim. Confronted with the fact that he was being questioned in connection with the murder by stabbing of a person whom he had indiscriminately admitted stabbing, Copeland gave the most likely false statement he could give, that he was not in his right mind when he committed the act. Regardless of whether the penal-interest exception for statements that exculpate a defendant requires analysis of the entire statement or its discrete assertions, the statement is not admissible.

As Judge Guy noted for the United States Court of Appeals for the Sixth Circuit in *Turpin v Kassulke*, 26 F3d 1392 (CA 6, 1994), in distinguishing the case from *Chambers v Mississippi*, 410 US 284; 93 S Ct 1038; 35 L Ed 2d 297 (1973), and *Donnelly v United States*, 228 US 243; 33 S Ct 49; 57 L Ed 820 (1913), the declarant's statement was not truly inculpatory:

> Most important, although Brown's statement arguably was against her penal interest, a reading of the statement as a whole reveals that Brown's purpose in making the statement was to *avoid* criminal liability to the extent possible,

not to accept it. . . . The rationale supporting the hearsay rule's penal-interest exception—that persons generally "will not make damaging statements against themselves unless they are true"—therefore does not apply to Brown's statement. [*Id.* at 1398 (citations omitted; emphasis in the original).]

Copeland's statement fails the threshold test of reliability that a reasonable person would not have made the statement unless it were true. Cf. *United States v Magana-Olvera*, 917 F2d 401 (CA 9, 1990); *United States v Tovar*, 687 F2d 1210 (CA 8, 1982).

The Court's response to the fact that Copeland's drug abuse excuse was not "*precisely,* and *only,* to the extent that it is, in fact, against [his] interest," *Watkins, supra* at 638, is a legal non sequitur and a factual misstatement. First, the Court employs a presumption that suspects in custody will shift blame to someone else, from which it concludes that Copeland's statement was against his interest because he did not explicitly shift blame to Barrera and Musall. Although blame-shifting statements are traditionally suspect, the Court errs in suggesting that the fact that Copeland did not shift the blame is evidence of reliability.[3] On the contrary, post-arrest statements are suspect because of the strong motivation to exonerate oneself, of which blame-shifting is a typical example. *Williamson,* 114 S Ct 2435.

In the criminal context, any statement that tends to reduce the charges or mitigate the punishment for which the declarant might be liable is considered self-

---

[3] While a different question might be presented had Copeland said he alone stabbed the victim, Copeland's incentive not to make a blame-shifting assertion does not logically lend any credibility to separate, even though closely associated assertions. *Watkins* at 639.

serving. See Graham, Federal Practice & Procedure (interim ed), § 6795, p 810, n 10. Shifting blame to another is one method of exoneration. It does not logically follow that if that method is not employed, another excuse is made more reliable.

Copeland's disincentive for not stating that the others also stabbed the victim is not the issue. The issue is whether Copeland's denial of any felonious intent and his claim that he was not in his right mind at the time of the stabbing is against his interest. The rationale in *Turpin* applies to any method of avoiding criminal responsibility and Copeland used the only out he thought was available to him: admitting to hiring a prostitute who liked "rough sex" and claiming that he should not be held responsible for his actions.[4]

Additionally, the Court errs in suggesting that Copeland's statement was not against his interest because he stated that he alone stabbed the victim, and the others did not participate. In fact, Copeland said:

> They had knives on them, but not to my knowledge.

In *Carson v Peters*, 42 F3d 384, 386 (CA 7, 1994), the court recently addressed a similar factual scenario. In *Carson*, the defendant sought to admit the declarant's statements because they failed to men-

---

[4] Because hiring a prostitute negated rape and using mescaline negated his mental state, neither of these admissions are in context truly inculpatory. As the court observed in dictum in *United States v Evans*, 635 F2d 1125 (CA 4, 1980), when a statement technically constitutes a confession, but, in actuality, its principal and perhaps only function is to support a defense against a charge of a more serious crime, "in reality, looked at in its totality, the statement is one *for* the declarant's penal interest, not *against*." (Emphasis in the original.)

tion the defendant as a participant. Judge Easter-
brook concluded that failure to mention the defend-
ant did not directly inculpate the declarant. Likewise,
in this case, that Copeland stated that he did not
know whether Barrera and Musall stabbed the victim
is not directly inculpatory of Copeland. He did not
state that he alone stabbed the decedent, he did not
say that he alone ripped off her clothes,[5] and he did
not say that he alone had sex with her.

B

### THE TEST OF ADMISSIBILITY FOR STATEMENTS OFFERED IN EXCULPATION IS NOT WHETHER THEY ARE PROBATIVE OF THE DECLARANT'S GUILT

The test for admissibility of statements offered in
exculpation is not whether they are probative of the
declarant's guilt. The Court erroneously cites *Rivera v
Illinois Dep't of Corrections*, 915 F2d 280, 282 (CA 7,
1990), to conclude that "MRE 804(b)(3) merely
requires that the statement be probative against the
declarant." *Ante* at 282. Judge Easterbrook explicitly
recognized in *Carson, supra,* that the rationale of
*Rivera, supra,* had been undermined by *Williamson.*

> If a statement is reliable enough to condemn its author,
> how can it be too unreliable to use when it cuts against the
> prosecutor? The answer is that different parts of a state-
> ment may have radically different degrees of reliability. . . .
> Portions of inculpatory statements that pose no risk to the
> declarants are not particularly reliable; they are just garden
> variety hearsay. That recognition supplies the basis of *Wil-
> liamson v United States*, [512] US [594]; 114 S Ct 2431; 129
> L Ed 2d 476 (1994), which holds that in federal cases

---

[5] Moreover, like the declarant in *Carson* who sought to protect a
brother or fellow gang member, Copeland's asserted lack of knowledge
was likely motivated by a desire to protect his friends.

judges must separate the incriminatory portions of statements from other portions for purposes of FRE 804(b)(3).

*Williamson* tells us that portions of a confession that do not inculpate the declarant are not reliable enough for prosecutors to use against anyone other than the declarant. The Constitution therefore did not compel Illinois to let [defendant] use the omissions [the fact that neither of the confessions mentioned the defendant as a third party] from the . . . statements. [*Id.*]

Copeland's statement that "not to my knowledge" had defendants stabbed the victim is a neutral statement regarding defendant's participation that is garden variety hearsay. The Court's use of the prosecutor's argument in Copeland's case does not address the question. The statement comes in against its maker because, regardless of its inculpatory aspects, it is an admission that is not hearsay. MRE 801(d)(2)(A).

In fact, the prosecutor's argument in Copeland's case is an argument that Mr. Copeland's statement that drugs had obliterated his intent was a lie and ought not to be believed by the jury. Thus, the state's theory of liability in the Copeland trial did not contradict the theory it followed in this case.

The essential disagreement between my view and that of the Court is whether Copeland's statement that he had no felonious intent and killed the victim while hallucinating is reliable enough to be used by the jury to exonerate Barrera and Musall. But it is precisely because the "why" is the most clearly untrustworthy aspect of the statement as a statement of exculpatory motive made to diminish Copeland's criminal liability that the statement does not satisfy the penal interest exception of MRE 804(b)(3). As

Justice O'Connor observed for the majority in *Williamson*:

> And when part of the confession is actually self-exculpatory, the generalization on which Rule 804(b)(3) is founded becomes even less applicable. *Self-exculpatory statements are exactly the ones which people are most likely to make even when they are false*; and mere proximity to other, self-inculpatory, statements does not increase the plausibility of the self-exculpatory statements. [114 S Ct 2435 (emphasis added).]

The rationale that persons generally will not make damaging statements against themselves unless they are true does not apply to Copeland's reason for stabbing the victim: that, although he forced himself to stab the victim because he thought she was Spooner, in effect, the devil made him do it.[6] That self-exculpatory statement is exactly one "which people are most likely to make even when they are false . . . ." Mere proximity to the self-inculpatory statement that Copeland stabbed her "does not increase the plausibility" of the self-exculpatory statement. 114 S Ct 2435.

Although Copeland's confession was not retracted, and there was no indication of the hope of any concessions, the statement regarding his state of mind is self-serving and not truly against his interest. It does not satisfy the rationale of MRE 804(b)(3).

---

[6] In context, it is clear that Copeland was avoiding blame:

*Q.* You knew exactly what you were doing when you pulled the knife out and stabbed the woman, is that correct?

*A.* I was in a different state of mind. I looked at a tree and could taste the color of the tree.

II

COPELAND'S STATEMENT WAS NOT
EXCULPATORY OF THE DEFENDANTS

Additionally, the defendants were not constitution-
ally entitled to the admission of Copeland's statement
regarding his state of mind because the presence or
absence of malice on Copeland's part was not excul-
patory of the state of mind of the codefendants. The
Due Process Clause does not require the admission of
statements proffered by the defense that are of "dubi-
ous exculpatory value." *Turpin, supra* at 1397.

Analysis of the exculpatory value of Copeland's
acts and state of mind is more difficult than the ques-
tion whether Copeland's statement was truly against
his interest. We have not had occasion since *People v
Aaron*, 409 Mich 672; 299 NW2d 304 (1980), to revisit
the question of the extent to which a co-felon may be
convicted of felony murder where it is claimed that
the death of a victim was not within the contempla-
tion of the aider and abettor co-felons or reasonably
foreseeable. *People v Pitts*, 84 Mich App 656; 270
NW2d 482 (1978).

While not free from doubt, it appears that the
Court's analysis of the exculpatory value of Cope-
land's statement is actually directed to this causation
question.[7] The thrust of that analysis is that Copeland
acted impulsively in the stabbing, and that his action

---

[7] It bears repeating in analysis of the question whether Copeland's state
of mind was exculpatory of malice on the part of the codefendants that
the focus of the inquiry is Copeland's excuse for why he killed the victim.
While the jury did not hear Copeland's statement, it did receive through
other evidence the substance of his confession, including that he was the
stabber. The only portion of Copeland's statement that the jury did not
learn through other means was that he stabbed the victim because he
thought she was Spooner.

is probative of defendants' theory that they were
merely present and that the stabbing was not within
their common enterprise and was not reasonably
foreseeable. This was the theory of defense that the
jury actually heard. The question of causation is
related to, but analytically distinct from, the question
before us, which is whether Copeland's professed
lack of malice is exculpatory of Barrera and Musall's
state of mind.

The jury convicted Barrera and Musall on the pros-
ecution's theory of aiding and abetting first-degree fel-
ony murder.[8] The crimes underlying this charge were
larceny and criminal sexual conduct. The trial court
properly instructed the jury that it could find the
defendants guilty of felony murder if convinced
beyond a reasonable doubt that there was a death,
the death was caused by the defendant, and, at the
time of the act that caused the victim's death, the
defendant was committing or assisting another in the
commission of either a larceny or criminal sexual
conduct and possessed the requisite intent for sec-
ond-degree murder.[9]

---

[8] The Court mischaracterizes the theories of liability. The felony-murder
charge premised on aiding and abetting did not require a "thought-out
plan to rape, rob, and then kill the victim." *Ante* at 292. Aiding and abet-
ting a felony is felony murder if malice can be inferred from all the cir-
cumstances. *People v Aaron, supra.* The crimes underlying the felony-
murder charge were larceny and criminal sexual conduct. The victim was
found without money, jewelry, or clothing. The jury also was instructed
on second-degree murder.

[9] Barrera and Musall must have been found either to have intended to
kill, intended to cause great bodily harm, or wilfully and wantonly disre-
garded the likelihood that the natural tendency of their behavior was to
cause death or great bodily harm. Under *Aaron*, the jury may infer these
states of mind from "[t]he facts and circumstances involved in the perpe-
tration of [the] felony . . . ." *Id.* at 728.

First, as a matter of law, Copeland's lack of intent would not negate his own malice for second-degree murder.[10] In *People v Langworthy, supra,* we rejected the claim that voluntary intoxication caused by drugs or alcohol negates the malice for second-degree murder. Accordingly, Copeland's intoxication excuse does not negate the mens rea for felony murder or criminal sexual conduct.

Second, Copeland's lack of malice would not negate malice on the part of either Barrera or Musall. Although Copeland's felonious intent is not to be vicariously imputed to Barrera and Musall, *People v Aaron, supra,* Barrera and Musall could be convicted of felony murder if they aided or assisted the commission of the felony of criminal sexual conduct with a life-endangering state of mind, that is, either intent to kill, intent to do great bodily harm, or under circumstances indicating their own wanton and wilful disregard of the likelihood that the natural tendency of their behavior was to cause "death or serious injury." *Id.* at 728.

In *Sharlow v Israel,* 767 F2d 373 (CA 7, 1985), the petitioner appealed the exclusion from evidence of alleged exculpatory statements of two defense witnesses. One witness would have testified that the codefendant said he was the one who had shot a person six times in the head. Another would have testified that the codefendant said he solicited the defendant to participate in a robbery and that the defendant refused and struggled with the codefendant to keep

---

[10] Neither criminal sexual conduct nor second-degree murder are specific-intent crimes.

him from shooting. The court found the first statement not to be exculpatory under *Chambers*.

> While [the] testimony did inculpate [the codefendant], her testimony was not critical to Sharlow's [the defendant's] case because it did not exculpate Sharlow from being a party to the crime of murder; thus, under the facts presented to the jury, Sharlow could still be found guilty for [the] murder under Wisconsin's party to a crime statute. [*Id.* at 378.][11]

Similarly, in this case, even assuming that Copeland's statement inculpated Copeland, it did not exculpate the defendants under a theory of aiding and abetting forcible sex. As long as the prosecution proved beyond a reasonable doubt that Barrera and Musall committed or assisted in committing either larceny or criminal sexual conduct with any of the life-endangering states of mind constituting malice, each could be convicted of felony murder even if Copeland was the sole stabber.

The question is not whether Copeland's statement that he "spontaneously" stabbed the victim is relevant to the defense;[12] the only question is whether state-

---

[11] The Court correctly observes that in Wisconsin, felony murder does not require proof of any mental state. *State v Oimen*, 184 Wis 2d 423; 516 NW2d 399 (1994). This is a different question than whether a codefendant is chargeable with felony murder when a co-felon has killed the intended felony victim. Michigan's party to a crime statute, MCL 767.39; MSA 28.979, like that of Wisconsin, abolishes the distinction between principals and accessories. Wis Stat Ann 939.05, Wisconsin's statute, in terms provides responsibility for any other crime "which under the circumstances is a natural and probable consequence of the intended crime."

[12] Copeland did not say that he "spontaneously" stabbed the victim. Copeland said that he did not discuss with Mark, Fred, and Mike that they were going to rape and kill the woman before arriving at the park—statements which, because they exculpate Copeland, are inadmissible under MRE 804(b)(3).

ments describing Copeland's mental state[13] support the defense theory that the defendants did not possess the requisite mental state for second-degree murder. Copeland's statement regarding his hallucination speaks only of his own state of mind. The relevant inquiry is whether Barrera and Musall possessed the requisite state of mind.

Stated otherwise, that Copeland confessed to stabbing the woman does not negate the possibility that Barrera and Musall also possessed a state of mind sufficient to be found guilty of felony murder. The requisite intent to be convicted as an aider and abettor is that necessary to be convicted of the crime "as a principal." *People v Kelly*, 423 Mich 261, 278; 378 NW2d 365 (1985). Malice as used in the context of second-degree murder for felony murder is a general intent crime and "if the aider and abettor participates in a crime with knowledge of the principal's intent to kill *or to cause great bodily harm*, he is acting with 'wanton and willful disregard' sufficient to support a finding of malice under *Aaron*." *Id.* at 278-279 (emphasis added).

Copeland is deemed in law to have acted with intent to kill. His professed absence of intent to kill

---

[13] First-degree felony murder is simply second-degree murder that occurred in the perpetration or attempted perpetration of a felony, and thus is statutorily elevated to murder in the first degree. *Aaron, supra* at 730, 734. Intent to kill is but one of the possible mental states sufficient to establish the malice element of second-degree murder. "While the intent to kill satisfies the malice requirement, it is not a necessary element of second-degree murder." *Langworthy, supra* at 650. If the perpetrator possesses the intent to kill, that does not transform second-degree murder into specific-intent crime. *Id.* at 651. Moreover, in a case involving multiple participants, any of the participants may possess any of the mental states that compromise malice and satisfy the mens rea element of second-degree murder.

would not exculpate defendants from responsibility for intent to do great bodily harm malice, or for reckless disregard malice—that is, a life-endangering state of mind involving forcible sex by four men that included ripping off the victim's clothes and kicking her. Evidence that Copeland had no malice because he was not capable of forming the mens rea is therefore no more exculpatory of Barrera and Musall's lack of malice than Musall's lack of malice would be if offered to exculpate Barrera or Barrera's lack of malice if offered to exculpate Musall.

Nor is the remainder of Copeland's statement exculpatory of the defendants. Barrera's and Musall's defense was that they merely were present at the scene of the crime. While Copeland's statement may support the defense that the murder was not preplanned, it does not support a defense that the defendants did not aid or abet a felony murder. Instead, Copeland said in his statement that Barrera was driving the car they used to pick up the prostitute, that Musall received fellatio from the victim, and that they all proceeded to rip off her clothes and to throw them around. When Copeland had the opportunity to tell the investigating officer that the defendants did nothing and were merely present, he failed to do so. For instance, when asked what his friends did once they arrived at the park, Copeland responded, "[Musall], he got some head from the woman, I don't recall what [Johnson] and [Barrera] were doing exactly." When asked whether his friends participated in the stabbing, Copeland answered, "[t]hey had knives on them,

but not to my knowledge."[14] When questioned about who kicked the woman, he stated, "I might have, I don't remember exactly." These statements are equivocal at best, and collateral to any arguably self-inculpatory statements. They are neutral, nonself-inculpatory statements that would appear to be excluded under *Williamson.* 114 S Ct 2435. Where Copeland could have said his friends were merely present, he instead claimed lack of memory.

Viewed in this light, this case is distinguishable from *Chambers, supra.* In *Chambers,* the prosecution's theory against the defendant was that he was the sole killer. As the Court stated, "[t]he State's proof at trial excluded the theory that more than one person participated in the shooting of Liberty. To the extent that McDonald's sworn confession tended to incriminate him, it tended also to exculpate Chambers." *Id.* at 297. When McDonald confessed to firing the fatal shot, the confession exonerated Chambers because the single person responsible for the crime was established to be McDonald, not the defendant.

While the Court recognizes that expert testimony could not establish or exclude multiple assailants, its analysis seems to assume that Copeland was the sole stabber. Copeland's statement does not indicate this, and the medical testimony indicated multiple stab wounds. In this case, the fact that Copeland stabbed the victim does not exculpate Barrera and Musall from also stabbing her, nor does it exculpate them from aiding and abetting the felony murder by participating in the underlying larceny and criminal sexual

---

[14] Copeland never told the officer that Barrera and Musall did not stab the victim.

conduct in circumstances indicating malice. Barrera's statement admitted that he kicked the victim in the head because she was screaming and that he was the driver of the car. Musall's statement indicated that Copeland demanded the victim's money in the car, that she began hitting him, that he hit her three or four times in the face, and that he had sex with her after they got to the park and after she said, "don't, don't." Accordingly, unlike McDonald's statement in *Chambers*, Copeland's admission that he stabbed the victim does not exculpate Barrera and Musall to the extent that it inculpates Copeland. Further, Musall's statement that he threw his knife away is consistent with the prosecution's theory that Barrera and Musall aided and abetted Copeland.

III

THERE ARE NO CORROBORATING CIRCUMSTANCES
INDICATING TRUSTWORTHINESS

Finally, the suppression of Copeland's confession does not violate the defendants' constitutional right to due process because the majority fails to identify any "corroborating circumstances [that] clearly indicate [its] trustworthiness . . . ." MRE 804(b)(3). As the Advisory Committee for the Federal Rules of Evidence noted, statements against penal interest that tend to exculpate an accused are more suspect than other statements against penal interest.

> "The refusal of the common law to concede the adequacy of a penal interest was no doubt indefensible in logic [citing Holmes' *Donnelly* dissent], but one senses in the decisions a distrust of evidence of confessions by third persons offered to exculpate the accused arising from suspicions of fabrication either of the fact of the making of the confession or in its contents, enhanced in either instance by the

required unavailability of the declarant. Nevertheless, an increasing amount of decisional law recognizes exposure to punishment for crime as a sufficient stake. The requirement of corroboration is included in the rule in order to effect an accommodation between these competing considerations. When the statement is offered by the accused by way of exculpation, the resulting situation is not adapted to control by rulings as to the weight of the evidence, and hence the provision is cast in terms of a requirement preliminary to admissibility. The requirement of corroboration should be construed in such a manner as to effectuate its purpose of circumventing fabrication." [*United States v Barrett*, 539 F2d 244, 250-251 (CA 1, 1976) (quoting Notes of Advisory Committee on Proposed Rules, 28 USCA, FRE 804, p 448).]

The presumption behind this rule is that a suspect in custody has a strong motivation to lie in order to exonerate himself. Thus, "[t]he requirement of corroboration was written into the Rule to guard against the inherent danger that third party confessions tending to exculpate a defendant are the result of fabrication." *United States v Guillette*, 547 F2d 743, 754 (CA 2, 1976).

In this regard, the Court's newly created balancing rule is fundamentally flawed. The Court states that the defendant's constitutional right to present exculpatory evidence and the requirement of reliability under MRE 804(b)(3) "may be viewed as having an inverse relationship: the more crucial the statement is to the defendant's theory of defense, the less corroboration a court may constitutionally require for its admission." *Ante* at 279.

Corroboration of hearsay statements is a constitutional requirement, even if the evidence is sought to be admitted by the defense. *Chambers* held that an accused has a due process right to the admission of

exculpatory hearsay provided it is accompanied by "persuasive assurances of trustworthiness." 410 US 302. *Chambers* stated: .

> The testimony rejected by the trial court here bore persuasive assurances of trustworthiness and thus was well within the basic rationale of the exception for declarations against interest. That testimony also was critical to Chambers' defense. In these circumstances, where constitutional rights directly affecting the ascertainment of guilt are implicated, the hearsay rule may not be applied mechanistically to defeat the ends of justice. [*Id.*]

In other words, *Chambers* indicates that due process requires hearsay rules to admit reliable declarations against penal interest. *Lee v McCaughtry*, 933 F2d 536, 538 (CA 7, 1991). *Chambers* does not hold that unreliable evidence may be admitted simply because it is extremely significant to the defense case.

Further, the admission of only slightly corroborated evidence because it is crucial to the defense is contrary to the intent of the Rules Committee. The Rules Committee purposely imposed the corroboration requirement as a prerequisite to admissibility because it recognized that statements exculpating the accused are "not adapted to control by rulings as to the weight [not admissibility] of the evidence . . . ." *Barrett, supra* at 251. The balancing rule, however, allows evidence that is not sufficiently corroborated under the constitution to be heard and weighed by the jury.

The Court adopts a three-part test to determine whether a custodial confession bears sufficient indicia of reliability to be admitted under MRE 804(b)(3). That test, taken from *United States v Garcia*, 986 F2d 1135, 1140 (CA 7, 1993), is (1) whether the confess-

ing party and the exculpated party have a close relationship, (2) whether the confessor made a voluntary statement after being advised of his *Miranda*[15] rights, and (3) whether there is any evidence that the statement was made in order to curry favor with authorities. *Ante* at 275.

This test is flawed in two respects. First, while a truly inculpatory and voluntary statement to police officers while in custody would indicate reliability, the fact that a statement is deemed voluntary under *Miranda* has no logical bearing on whether the declarant's confession was free of the motive to mitigate the declarant's role in the offense. *Lee v Illinois*, 476 US 530, 544; 106 S Ct 2056; 90 L Ed 2d 514 (1986); *United States v Flores*, 985 F2d 770, 782 (CA 5, 1993). As set forth above, even though Copeland's statement was made voluntarily, his purpose in making the statement was to avoid criminal liability to the extent possible.[16] Second, the test uses the absence of evidence of currying favor as indicating trustworthiness. As the court in *Flores* observed, however, "statements by suspects to law enforcement officials inculpatory of third parties are excluded because of the *presumption* that such motives exist, and the absence of evidence does not remove this presumption." 985 F2d 782 (emphasis in original). A like presumption exists when, as in this case, the declarant attempts to minimize his own participation in the crime. By contrast with the situation where the absence of a motive to fabricate indicates reliability, Copeland's drug-

---

[15] *Miranda v Arizona*, 384 US 436; 86 S Ct 1602; 16 L Ed 2d 694 (1966).

[16] See, e.g., *Turpin, supra* at 1397, which observed that the declarant's statement was unreliable in part because it was made to a police interrogator and was not a spontaneous utterance to a close acquaintance.

induced excuse indicates fabrication in an attempt to gain whatever he could in the difficult situation he faced. Thus, two of the three prongs of the *Garcia* test do not aid the determination of the reliability of the custodial statement.

The third *Garcia* factor inspects the relationship between the confessor and the party exculpated in the confession. In applying the test to the facts of this case, the opinion simply states, "we find that there was not a close relationship between Copeland and Barrera that would induce Copeland to 'take the rap' for Barrera." *Ante* at 289. (The Court does not apply the test to the facts of Musall's case.) The conclusion is belied by the evidence in this case. First, in Copeland's confession, he refers to Barrera, Musall, and Johnson as "my friends" several times. In discussing the night in question, Copeland says that "[m]e, my three friends Mark, Fred and Mike we decided to get together and go out last Thursday night and to have a few laughs and get high off Mescaline drugs." Thus, it was not fortuitous that the four suspects were together on the night of the murder; they had arranged the evening previously. In fact, their relationship was such that all four could agree to have sex with the same woman and Copeland, as the ringleader, did the talking for them because his friends did not know how to talk to girls. In addition, Barrera and Copeland were together on the night that they were arrested.[17] Finally, given that Copeland had rea-

---

[17] To the extent that the Court concludes that MRE 804(b)(3) "merely requires that the statement be probative against the declarant," *ante* at 282, it is in error. *Garcia* correctly notes that once the evidence is determined admissible, its weight is for the jury. The statement is consistent with the advisory committee's admonition that

son to believe that the fact that he stabbed the victim was known by "everyone else," he might well have thought that he had no choice but to accept blame, yet claim that he did not know what he was doing. The analysis also distinguishes this case from *Donnelly, supra.* In *Donnelly,* Justice Holmes noted that "there was no ground for connecting Donnelly with Dick [the confessor]." 228 US 277. The evidence in this case was to the contrary—Copeland and the defendants were friends and "running buddies."

That leaves only one source of corroboration for Copeland's statements—the statements of the defendants. Yet, as the Court recognizes, "if the only corroborating circumstance was the individual defendant's statement, standing alone, we might have a different situation." *Ante* at 278. Such corroboration is constitutionally deficient. *Turpin, supra* at 1397-1398; *United States v Rodriguez,* 706 F2d 31, 40 (CA 2, 1983); *United States v Annese,* 631 F2d 1041, 1045 (CA 1, 1980).

The legislative history of the rule demonstrates that the House committee rejected the notion that penal statements "simpliciter" contained sufficient corroboration, because even the accused's own testimony might meet this test and inserted the language requiring corroborating circumstances that " 'clearly indicate the trustworthiness of the statement' . . . ." 1974 US Code Cong & Admin News, pp 7089-7090.

---

[w]hen the statement is offered by the accused by way of exculpation, the resulting situation is not adapted to control by rulings as to the weight of the evidence, and hence the provision is cast in terms of a requirement preliminary to admissibility. [Notes of Advisory Committee on Proposed Rules, 28 USCA, FRE 804, p 448.]

Indeed, as the trial court and Court of Appeals noted, Copeland's statements and those of the codefendants were inconsistent in several respects. Defendants contend in effect that Copeland said they did nothing, while Barrera admitted that he kicked the victim in the head before Copeland killed her and that Musall had oral sex with her after the forcible sex began.

The Court points to no corroborating circumstances indicating the statement is trustworthy. While purporting to recognize that statements of the codefendants do not furnish corroboration, *United States v Rodriguez, supra*, the application of the balancing rule uses the purported consistency between defendants' statements and Copeland's statement as corroboration of the reliability of the excluded evidence. The only other corroboration offered is that Copeland spoke after being advised of his rights, and the conclusive statement that there was not a close relationship between Barrera and Copeland. *Ante* at 289-290.

In conclusion, because the defendants failed to establish that Copeland's statement fulfills the requirements of MRE 804(b)(3) and was sufficiently reliable that its exclusion denied the constitutional right to due process, I would affirm the decision of the Court of Appeals.

WEAVER, J., took no part in the decision of this case.